FRANK BISHARD, Senior, Administrator, Appellant, v. E. R. ENGELBECK, Appellee.

NEGLIGENCE: Acts Constituting Negligence—Automobile Accident—Evidence. Evidence attending the death of a boy by being hit by an automobile reviewed, and held insufficient to show any negligence on the part of the driver in operating the car or giving warning signals.

NEGLIGENCE: Acts Constituting Negligence—Automobile Accident—Failure to Give Signals. Failure of the driver of an automobile to give a warning signal on approaching another vehicle from the rear is not negligence when there was no apparent necessity for such warning until practically the instant of collision.

*Appeal from Polk District Court.*—W. H. McHENRY, Judge.

MONDAY, SEPTEMBER 24, 1917.

APPEAL from a judgment for costs upon a directed verdict in favor of the defendant.—*Affirmed.*

*F. T. Van Liew* and *A. L. Garvey,* for appellant.

*Brammer, Lehmann & Seevers,* and *John L. Gillespie,* for appellee.

STEVENS, J.—On a clear day in October, 1914, about 12:45 P. M., the defendant was driving a Cadillac automobile south on East Twelfth Street in the city of Des Moines near the Henry Wallace school building, a short distance south of a railroad crossing. He turned his car to the left for the purpose of passing a vehicle drawn by one horse. There appear to have been no other vehicles and no pedestrians on the street in that vicinity. Immediately after the car was turned to the left, and when from 25 to 28 feet from a railroad crossing, it collided with Frank Bishard, Jr., a six-year-old boy, killing him instantly. The street at the point of the accident was paved with asphalt. The horse attached to the vehicle, which was a light wagon, was driven by Ben Biber, who testified that he was soliciting repair work, and that he did not see the accident nor know of the presence of deceased upon his wagon or in the vicinity until after the accident. The only eyewitness to the accident who testified was Walter Collings, a boy fourteen years of age, who stated, in substance, that, at the time of the accident, he was on Cleveland Street, to the north, going east, and that he saw the wagon and automobile in the street, and the little boy sitting on the rear end of the wagon box. We take the following extracts from the appellant's abstract:

1. NEGLIGENCE: acts constituting negligence: automobile accident: evidence.

"He was on the end of the wagon, sitting up on the end. The next movement I saw him make, he kind of turned around and jumped off and started east towards the school ground. He kind of turned around and slid down and held on to his hands and jumped on the ground, and started to run east. * * * I heard the brakes when Mr. Engelbeck put them on; I noticed him rise from his seat a little bit when he put on the brakes, a little before he struck the boy. * * * The machine was not going so very awful fast. It slowed up pretty quick after it struck the boy. I noticed whether or not the wheels made a mark on the paving. The machine stopped on the east side of the street about four or five feet from the curbing. The machine did not run over the boy. The head of the boy's body was lying toward the west after he was struck by the machine. There was blood upon the paving there. The wagon was in about the middle of the street. Mr. Engelbeck was coming up about the middle of the street. Frank Bishard did not make any movement after he was struck."

On cross-examination, he further testified:

"Q. Where was the automobile when you think you first noticed it? A. About half way between Washington and the railroad track. Q. You saw it before it got to the track? A. Yes, sir. Q. And after it crossed them it struck the little Bishard boy? A. Yes, sir. Q. Did it cross those railroad tracks going at a very rapid rate? A. Not so very fast, no, sir. Q. You do not think it was going fast? A. No, sir. Q. And shortly after the automobile had crossed the railroad track did it overtake the wagon? A. Yes, sir. Q. That was also going south on the same street? A. Yes, sir. Q. When it got to the wagon, how did it attempt to pass the wagon, by going to the left or to the right of it? A. To the left of it. Q. It went to the left of the wagon? A. Yes, sir. * * * Q. And when he dropped off the wagon you say he started to run to

the east? A. Yes, sir. Q. And you say you saw him run into the right front fender? A. Yes, sir. Q. And fall back? A. Yes, sir. Q. He was not knocked a long ways south, was he? A. No. Q. He fell right back? A. Yes, sir. Q. Just before the automobile hit Frank you think you saw Mr. Engelbeck get the brakes on? A. Yes, sir. Q. Do you remember whether that—the street was smooth where it crossed the Northwestern tracks or was there a bump there? A. There is a bump on the north side of the track. * * * Q. Now, when little Frankie hit the fender he sort of fell over backwards? A. Yes, sir. Q. And you think his feet stayed just about the same place where they had been? A. Yes, sir. Q. And simply his head went back and down? A. Yes, sir. Q. So his feet just about marked the spot where he was standing when he was hit? A. Yes, sir. Q. And he fell practically due west? A. Yes, sir. Q. So he was stretched out east and west. Could you make a fair estimate as to how fast that automobile was going? A. No, sir; I don't believe I could. Q. You would not care to say how many miles an hour? A. No, sir. Q. You do not think it was going over ten miles an hour, do you? A. No, sir; I don't believe so. Q. You do not believe it was going that fast? A. No, sir. Q. You think that Mr. Engelbeck got the brakes on just about the instant the boy dropped from the wagon? A. Yes, sir; about the instant he was hit. Q. Got them on about an instant before he was hit? A. Yes, sir. Q. And about an instant before he dropped from the wagon? A. Yes, sir. Q. There was not very long between the two? A. No, sir. Q. Because the boy started to run? Court: Where did he hit the automobile, in front or on the side fender? A. The side fender. Q. He never got square in front of the car? A. No, sir. Q. He never did get over in front of the automobile? A. No, sir. Q. He ran into the side of the fender? A. Yes, sir."

He further testified that he was west of the car when the accident occurred. The evidence shows that there was a bump at the railroad crossing, and Collings testified:

"I heard the bell in the railway tower ring there about this time. The gates were not lowered; a hand car passed up the railroad at this time. That was immediately after Mr. Engelbeck passed. The bell in the tower began to ring before Mr. Engelbeck reached the track. He didn't seem to increase his speed very much that I could notice. He ran about the same speed until the brakes were applied."

He further testified that the front wheels of the car were 3 or 4 feet from the east curb when the automobile stopped. Another witness testified that he arrived at the scene of the accident very shortly thereafter; that the pavement was dry; and that the marks thereon showed that the wheels of the automobile had slid about 27 feet.

The driver of the wagon testified that he did not hear the tower bells or the railroad bells ring as he crossed the track; that the first thing he noticed was an automobile coming along to the left-hand side of him in the street; and that he did not know of the accident until after it was all over, and he looked back and saw the boy lying on the pavement. He further testified:

"The automobile was on the left side of me when it stopped, that is, the east side of the street. I did not see the hind wheels. Q. How much of the machine did go by you just as the accident occurred? A. About 5 or 10 feet ahead of me. Q. The front end of the automobile was 5 or 10 feet in front of your wagon? A. Yes, sir. Q. And it stopped, and you drove on a little ways to the engine house? A. Yes, sir. Q. Was that the front or back end of the machine was 5 or 10 feet in front of you? A. The front end."

C. M. Staves testified that the defendant called his attention to the accident; that he at once went to the scene

thereof, where he found the body of deceased lying on his breast, with the left side of the face down, his feet toward the west, and his head to the east. The witness Collings testified that the body lay in substantially the position as indicated by the witness Staves, except that he said that the head was to the west and the feet to the east.

The undertaker who prepared the body for burial testified that the skull was crushed, and a part of it driven into the brain; that the injuries were on the left side of the forehead; and that the skull was fractured all over the left side, extending from the temple back into the region of the ear.

Concerning the movement of the automobile, the witness Biber further testified that he saw a peculiar motion of the wheels of the automobile, as follows:

"I saw a peculiar motion of the wheels on the automobile: they jumped off, and a little bit later stopped. The automobile that struck the boy,—the wheels jumped off something, like they fell over a brick or something. I didn't see the wheels slide. The body of the boy lay on the left side of the street as you face the south. The wagon box I had that day is about 7 or 8 inches deep."

Counsel for appellant have furnished us an elaborate brief, collecting and citing authorities relating to the law governing the operation of motor vehicles upon the streets and in the public highways. In view of the conclusion reached upon the questions of fact, it is unnecessary for us to review the authorities. The court, in ruling upon the motion to direct a verdict, made some reference to the question of contributory negligence upon the part of the deceased. Its ruling was not, however, based thereon. Contributory negligence as a question of law is not involved upon this appeal.

The negligence charged in plaintiff's petition is: (a) That defendant was driving his car at a high, reckless and

unreasonable rate of speed, and on account thereof was prevented from having and did not have proper control thereof; (b) that he failed and negligently omitted to sound a horn or give other signal or warning to the deceased of his approach. Other allegations of negligence will be disregarded, as no evidence was offered to sustain the same.

As we understand the evidence, the deceased was sitting on the rear end of a wagon box, facing north and slightly to the east, looking in the direction of the school building, and the automobile was approaching from the north. At just what point in the street defendant first observed the vehicle and deceased does not appear in the evidence; but, as the body of deceased was lying about 25 or 28 feet from the railroad track, he must have turned the automobile to the left for the purpose of passing the wagon very shortly after crossing the railroad. The relative location of the automobile to the rear end of the wagon at the instant deceased dropped to the pavement is not shown; but, if the automobile slid approximately 27 feet after the brakes were applied, and the front end thereof passed the driver of the vehicle 5 to 10 feet, it may be assumed that the front end of the automobile was not far north of the north end of the wagon. Collings testified that the defendant applied the brakes an instant before he struck the boy. The time occupied by the boy in getting off the wagon to the pavement and running to the point where he collided with the automobile was undoubtedly very short.

The course taken by the automobile indicates that it continued southeast from the point where the driver started to turn out to go around the wagon until it stopped near the curb. The course of the automobile was apparently all the time away from the wagon towards the southeast. Collings observed the accident from the west side of the street. He testified that he saw the automobile strike the boy, and saw him fall. The fact that he was struck by the right-

hand or west fender shows conclusively that he was all the time on the west side of the automobile. The courses of the automobile and the boy, though at different angles, were in the same direction towards the east.

Walter Keefner, another school boy, testified that the pool of blood on the pavement where deceased was lying was very near the center of the street, and that, when he arrived, the automobile was on the left side of the street, towards the school house, the hind wheels thereof being from 20 to 25 feet from the pool of blood.

John Bishard said he did not measure, but guessing at the matter, would say that the distance from the pool of blood to the hind wheels of the automobile was about the same as the width of the street, which the evidence showed was 34 feet.

Biber testified that his wagon was within 3 or 4 feet of the west curb when the automobile attempted to pass him. The theory of the witness Collings is that the defendant applied the brakes an instant before he struck the boy. The boy must have been near the rear of the wagon at the time he was struck by the automobile, as Biber testified that he did not see him until after he had driven some distance south. The distance traveled by deceased from the rear end of the wagon to the point of the collision could not have exceeded a few feet. The time allowed the driver to set the brakes and stop the automobile after the boy climbed to the pavement was very brief.

According to the testimony of Collings, the boy was struck by the right fender of the automobile. The radiator and front end of the machine had therefore passed him before the collision, for the automobile was headed southeast, and the front end had passed deceased before the collision. It might be inferred that deceased was going toward the automobile at the instant of the collision. The course of the automobile was most favorable to avoid the

collision. It is possible that, an instant before he was struck by the automobile, deceased became confused, and was either standing still or running toward the automobile at the time of the collision; but in any event, the time that elapsed between the instant when deceased climbed from the wagon to the pavement and the instant of the collision afforded but little opportunity to the driver of the automobile to change the position thereof, or to do more than apply the brakes; and this the evidence shows he did. He could not have applied the brakes, guided the machine, and given a warning signal after the boy started from the pavement to the east, before the collision.

While the accident occurred in the vicinity of a school building, it was in the rear thereof, and at a time when no other school children, pedestrians, or vehicles, except the wagon above mentioned, were upon the street or in that vicinity. The right of defendant to turn to the left and pass the wagon is not in controversy; but, of course, in doing so he was bound to exercise a degree of prudence and caution commensurate with the circumstances surrounding him at the time, taking into consideration the character and high power of the machine he was operating. *Delfs v. Dunshee*, 143 Iowa 381; *House v. Cramer*, 134 Iowa 374; *Strand v. Grinnell Automobile Garage Co.*, 136 Iowa 68. He was not bound to anticipate or know the intentions or purpose of deceased, if he saw him sitting on the end of the wagon box, nor, indeed, could he know.

Taking into consideration all the facts

2. NEGLIGENCE: acts constituting negligence: automobile accident: failure to give signals.

and circumstances surrounding the transaction, it is difficult to see how greater care could have been exercised by the defendant to avoid the accident. He did not sound the horn or give other warning to the driver of the vehicle or to deceased of his approach; but, before the boy got off the wagon, there was no apparent necessity for his do-

ing so, and, under the circumstances, it cannot be said that he was negligent in failing to give a signal of his approach and of his intention to pass the vehicle.

The doctrine of the last clear chance is argued by counsel, but we are unable to see how the same can be applied to the facts in this case.

Had a verdict been rendered upon the testimony offered, it could not have been permitted to stand. We think, therefore, that the court rightly sustained the motion of the defendant to direct the jury to return a verdict in his favor, and the judgment of the lower court is, therefore,— *Affirmed.*

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.