GLADYES G. GLOVER, Administratrix, Appellee, v. MALCOLM VERNON et al., Appellants.

No. 44579.

MAY 9, 1939.

REHEARING DENIED SEPTEMBER 22, 1939.

Havner, Flick & Powers and J. C. France, for appellee.

Hallagan, Fountain, Stewart & Cless and James E. Remley, for appellants.

HAMILTON, J.—The accident, which resulted in the death of Charles Lee Glover, plaintiff's intestate, occurred a little over one-half mile west of Mechanicsville, Iowa, on highway No. 30. The paved portion of the road is 18 feet in width with two black lines in the center, having solid dirt shoulders, which were sodded with bluegrass, approximately six feet wide on each side of the pavement. For a considerable distance each way from the scene of the accident the pavement is practically level and there were no vehicles on the highway and nothing to obstruct the vision of the operators of the two trucks involved in the accident. The pavement was dry and it was ten a. m. of a bright, sunny day. Both trucks were proceeding westward. The truck in the rear, which we will refer to as defendants' truck, was owned by defendant Vernon and was being driven by defendant Simmons, with the owner's consent. The other truck,

owned and operated by plaintiff's intestate, was a Nash car made into a truck with a homemade bed or rack. It had no cab, the back of the driver's seat being against the rack. Defendants' truck was licensed to haul a maximum load of 10,000 pounds. On the morning in question, Simmons had picked up nine head of cattle, weighing approximately 1,000 pounds each, at a farm east of the town of Olin to be transported to Cedar Rapids, Iowa. He proceeded south from Olin to highway No. 30 and thence west. As he reached Mechanicsville, the truck driven by the deceased drove out of a side road onto highway No. 30 and turned west ahead of defendant and the two trucks proceeded west from Mechanicsville. When defendants' truck passed Park's garage, located about one-half mile west of Mechanicsville, the distance between the trucks was in the neighborhood of 150 to 200 feet. At the same time, Earl Green was hitchhiking to Cedar Rapids and was walking along on the north edge of the pavement going in the same direction as these trucks and was the only eyewitness to the accident other than Simmons. He heard the trucks coming behind him and stopped and turned around and was watching them. At this time, Glover's truck was about 40 feet from him and the defendants' truck about 75 to 90 feet behind the Glover truck. He stood and watched until Glover's truck was within 20 to 30 feet of him at which time he stepped out on the shoulder about three feet. The collision occurred about six feet west of where he stood. As the Glover truck approached Green, it slowed down and pulled to the left over the black lines. About the same time, defendants' truck undertook to pass Glover and in doing so the right front corner of the rack of defendants' truck caught the left rear corner of the rack of Glover's truck, shoved some of the timbers forward forcing Glover's body against the steering wheel and one of the boards through the windshield. The Glover truck proceeded on in a northwesterly direction off of the pavement into the ditch where it came to a stop about 60 feet west of the point of collision; defendants' truck proceeded on west and was driven out onto the north shoulder and parked about 200 feet west of accident. Glover's body was limp, his head hanging over toward the running board. A doctor was summoned who administered first aid treatment. Later an ambulance arrived and the doctor accompanied the body to a hospital in Cedar Rapids. The doctor was of the opinion that Glover

regained consciousness sufficiently to recognize his wife before he died but the record is barren of any statement made by him. At the close of the plaintiff's evidence, defendants jointly and severally moved for a directed verdict and this was renewed at the close of all the evidence, defendants contending then and still contending that there was not sufficient evidence of negligence as to any of the alleged grounds to take the case to the jury and also contending that the evidence showed, as a matter of law, contributory negligence on the part of Glover.

▮▮▮ We have examined the authorities cited in the briefs and have read the entire record as contained in the transcript and have endeavored to weigh and interpret the evidence dispassionately and carefully, fully realizing that the record presents some close questions. However, when stripped of the words put into the mouths of the witnesses by counsel and when the testimony as voluntarily related is given the interpretation which the witnesses intended, unassisted by what we will call legitimate suggestion, the record presents a fairly simple situation and the jury was warranted in finding, as it no doubt did find, that this accident came about because of the failure of Simmons to exercise that reasonable care and caution which an ordinarily prudent person would have exercised under the circumstances. Here was Green, who was crippled in such a way that he was required to sort of drag his right foot as he walked, walking down this pavement in broad daylight. As the cars approached, he heard them, turned around facing them. The car in front heeded the admonition of the legislature (Code section 5031) to have his car under control and reduce the speed to a reasonable and proper rate when approaching and passing a person walking in the traveled portion of the public highway, slowed down and pulled to the left over the black lines; while Glover's truck was in this position, the Simmons' truck, failing to take notice of what the jury could have found an ordinarily prudent person would have done, did not reduce his speed correspondingly until Glover's car could again return to the right of the black lines; and failing to take note of such situation, as the Glover car slowed down, the Simmons' truck, because of the speed he was going or more correctly speaking because of his failure to reduce his speed could not stop, was compelled to pass Glover's truck at a point where Glover was, under the statute, required to be in passing Green

and, in attempting to pass Glover, the speed of defendants' truck was such that he was unable to negotiate it successfully. When the deputy sheriff, who arrived on the scene very shortly after the accident, inquired of Simmons why he did not stop, Simmons replied, "When he slowed up, of course, I was too close to him. I just could not stop so I tried to go around him." Throughout the entire argument on the part of the appellants, great stress is laid upon the fact, as appellants contend, that Glover slowed down "suddenly". An examination of the transcript of the evidence touching this point plainly reveals an instance of what we heretofore referred to as "legitimate suggestion" on the part of counsel. There was plenty of this sort of thing indulged in by counsel on both sides. In other words, this word was put in the mouth of the witness by astute counsel who very carefully, later on in the examination, had the witness confirm the statement originally made by counsel. On this point let us review the evidence of Mr. Green. He made a written statement soon after the accident wherein he said:

"It appeared that this truck (Glover's truck) was slowing down. It was going about 15 m. p. h. at the time of the collision."

On the witness stand, as a witness for plaintiff, he testified on cross-examination as follows:

"Q. The Glover truck slowed down, didn't it? A. Yes, sir.

"Q. Slowed down quite suddenly there and pulled over the black line? A. Well, it pulled over the black line, I suppose that was because I was standing there at the time.

"Q. Were you trying to get a ride? A. Well, I was not trying to from them fellows, I just stood there watching the trucks as they approached. * * *

"Q. Well now, the Glover truck as it came up towards where you were, slowed down? A. Yes, sir.

"Q. Now, before that, the cattle truck, we will say the Vernon truck, had started to pass it, hadn't it? A. Not at the time.

"Q. Well, when did it start to pass? A. Well, after Mr. Glover had pulled over about six inches over the black line.

"Q. And you heard the horn? A. Yes, sir.

"Q. Did the horn sound on the Vernon truck before the Vernon truck swung out to the left? A. It was already out to the left.

"Q. Well now, Mr. Green, the Vernon truck went on to the south shoulder, didn't it? A. Well, I think that the rear wheels were off, I am pretty sure they were. * * *

"Q. Mr. Green, as you stood there looking at this, what you mean to tell these jurors here is that this accident happened about five or six feet beyond you, that is west of you? A. Yes, sir.

"Q. That just before the accident, Mr. Glover suddenly slowed his truck down, didn't he? A. Yes, sir.

"Q. Your answer is yes? A. Yes.

"Q. And when he did that, he swerved his truck to the left across the black line, didn't he? A. That was before he got to me.

"Q. That was before he got to you? A. It was.

"Q. That was why he was slowing down? A. Yes, and I stepped off the paving."

On re-direct examination, Green testified further that, when he first stopped on the paving and turned around, the Vernon truck was traveling about 30 or 35 miles an hour and the Glover truck "about 20 as it began slowing up" and that at the time he actually stepped off of the paving the Glover truck was about 20 to 30 feet east of where he stood. He also testified that there was broken glass and debris from the wrecked truck in the north half or alley of the pavement from the point of collision to where Glover's truck went into the ditch. It will be observed that the witness never used the word, "suddenly". When the evidence is analyzed, one is bound to recognize the inherent weakness of the proof, elicited in this manner, of the claimed "suddenly" slowing down of the Glover truck, making its weight and credibility for the jury.

Turning to the testimony of Simmons, we find that for at least 40 or 50 rods east of the scene of the accident, he was traveling 30 or 35 miles an hour according to his own testimony. When he reached a point 75 to 90 feet from the Glover truck, he says he started to pass him. Simmons gave the following testimony:

"Q. Just tell the jury what you did when you decided to pass the Glover truck? A. Well, it seemed as though I was traveling a little faster than Mr. Glover and I came up to about seventy-five feet, I would say, I blew my horn and started around, pulled to the left-hand side of the pavement. As I got within twenty or twenty-five feet, I don't know for sure, he swerved to the left and slowed down, and all I could do was take the shoulder, which I did. I took the shoulder and his truck was over the black line, I don't know how far over, I did not measure it, but I hit him and I drove on ahead and parked my truck and went back. * * *

"Q. Well, how far were you from him when he started to slow down? A. About twenty or twenty-five feet.

"Q. Did he slow down gradually or abruptly, which? A. Well, he slowed down quite quick, yes, sir."

Again, it will be noticed that, in the narration of the story by the witness, he said nothing about "suddenly" slowing down. Glover could not have been going over 30 miles per hour for Simmons was only traveling 30 or 35 miles an hour. There is no evidence that the Glover truck had slowed down at the time of the accident to less than 15 miles an hour. Taking into consideration the speed at which Simmons' truck was traveling and the distance covered, the court and no doubt the jury too, perhaps may not have been favorably impressed by the argument of counsel as to this question. There is some variance between Green's statement taken a couple of days after the accident and his sworn testimony at the time of the trial in two particulars which he attempts to explain; his credibility was for the jury.

The court must take into consideration that witnesses such as Green and Simmons, in the instant case, in testifying as to speed, location and distance are not attempting to give answers mathematically accurate. It must be assumed that they are giving their judgment or estimate gained by observation during a fleeting second or two of time. It is for the jury to take these estimates with all the other evidence and circumstances disclosed and attempt to arrive at the very truth of the matter. In considering a matter of this kind, where the events happen so rapidly, seldom is it possible for a court by judicial fiat to unerringly point to some one statement as distinguished

from all others and declare that this and this alone must be and is the exact truth.

In substance, the grounds of negligence submitted were: (a) lack of control; (b) failure to sound horn; (c) excessive speed; (d) failure to properly apply brakes; (e) not equipped with proper brakes; (f) violation of clear distance ahead statute; and (g) last clear chance.

At great lengths, in briefs containing more than 100 pages, each side has presented arguments pro and con as to the sufficiency of the evidence tending to support the several grounds of negligence and bearing on the question of plaintiff's intestate's freedom from contributory negligence. We cannot undertake, within the proper compass of an opinion, to take up separately each and every point made. No new legal question is involved; the whole dispute is over the application of well known rules of law.

Appellants' principal argument is based upon the theory that, as defendants' truck approached the Glover truck from the rear and had reached a point about 75 to 90 feet therefrom, defendants' driver Simmons sounded his horn and pulled over onto the left half of the pavement for the purpose of passing the Glover truck; that Simmons had a clear way as far as he could see until he got within 20 to 25 feet of the Glover truck when Glover, suddenly and without warning, slowed down and swerved his truck left over the center lines of the pavement; that, because of the close proximity of the trucks, Simmons, faced with an emergency, was unable to avoid the collision; that, while defendants' truck was equipped with mechanical brakes which were in good order, which he applied, there was not sufficient room or distance in which to stop the truck by the application of the brakes; and that, while he pulled over on the shoulder, he was unable to get over far enough, in the short space between the trucks, to avoid the accident.

Needless to say that had the jury taken this view of the case there could have been no recovery. The difficulty with the theory is that there was a conflict in the testimony and that, under the record, neither the court below nor this court is permitted to say that the minds of reasonable men would not differ as to the legitimate inferences to be drawn from the facts and circumstances shown bearing upon all the issues involved. The testimony of the witness Green as to the position of these two

trucks would warrant the jury in finding that Glover's truck was already over the black lines in passing Green at the time Simmons undertook to pass and at the time Simmons sounded his horn. The jury could have found that Glover was never over the black lines over eight inches which would still have left room for defendants' truck to pass without getting off the pavement. The evidence is in dispute on the question of whether the Simmons' truck was out on the shoulder or how far it was out or at what particular point from the place of the collision it left the pavement. No one claims it was out on the shoulder more than the width of the rear dual tires. There is no question that Simmons did sound his horn but whether it was sounded in time to serve as a warning is in dispute. Simmons says he sounded his horn before he started to pass; however, Green says Simmons was already over on the left side when he sounded the horn. There is no evidence, other than the sounding of the horn, that Glover knew of the presence of the other truck. It is claimed that Simmons was traveling only 35 miles an hour and it is appellants' contention that there was no excessive speed. There could be excessive speed even if the speed limit was not exceeded under the circumstances confronting the defendant. Simmons was cognizant of the entire situation; he saw the man walking down the road. Both of these truck drivers were required to take notice of the statutory provisions, contained in section 5031, applicable to the situation confronting them with this man walking on the traveled portion of the highway. While there is no direct evidence that the brakes were not in good condition, there is evidence that, with the load this truck was carrying, it was impossible to slide the wheels with the mechanical brakes with which it was equipped.

█ There was evidence that Simmons was 75 to 90 feet behind the Glover truck when Glover's truck was 40 feet east of where Green stopped on the pavement and turned around to watch the approach of these trucks. He stepped off of the pavement when Glover's truck got within 20 to 30 feet of him. The collision occurred six feet west of where Green stepped off of the pavement. Hence, Glover traveled 46 feet during the time the other truck had to travel 75 to 90 feet plus 46 feet or 121 to 136 feet to the point of collision. There was evidence that defendants' truck, with the load it carried, could have been stopped, at the rate of speed it was traveling, within 90 feet if

the brakes were properly applied as firmly as they might have been. Simmons himself said, "I could not slide the tires with this load. I believe I could stop it in 90 feet but tires would not be sliding" and the owner of the truck testified, "With the load of 9000 pounds, brakes have never been so that they could slide the wheels. Could have stopped in 75 to 90 feet." Simmons had on a tremendous load and there was evidence that Simmons said that "driving a truck with that load of cattle was a mighty hard job. If a sudden stop was made, it would lurch the cattle * * * and that he did not skid the wheels and did not lurch the cattle." With this immense weight, a high degree of care was required of Simmons as he faced the situation of a truck in front of him meeting a person walking upon the pavement and, as stated in Bishard v. Engelbeck, 180 Iowa 1132, 1140, 164 N. W. 203, 206, "he was bound to exercise a degree of prudence and caution commensurate with the circumstances surrounding him at the time", taking into consideration the heavy load and the difficulty in stopping his truck with the kind of brakes with which the same was equipped. We think it was for the jury to view this entire picture,—the width of the paving, the solid 5½-foot shoulder even and level with the pavement, a level dry road, a bright sunshiny day; the pedestrian in plain view of both drivers, crippled so that he dragged one of his feet; the probability of the driver of the Glover truck turning out in passing the footman and retarding his speed in doing so, in compliance with section 5031 of the Code; the fact that the shoulder was wide enough and solid enough to drive the entire load of cattle out upon the same in safety, as was done by Simmons, immediately after the accident; the position of the two vehicles immediately before the attempted passing by Simmons of the Glover truck and all the other facts and circumstances and the legitimate inferences to be drawn therefrom,—and in so far as possible place the blame where it belonged.

Some other jury might have found for the defendants; this court, if it were passing on the facts, might find for the defendants, but, under our system, the court cannot substitute its judgment, when disputed facts are involved, for that of the jury. Simmons does not claim that he slackened his speed at any time. Appellants argue that Simmons had a right to assume that the Glover truck would obey the law and remain on the

right half of the pavement and cites Young v. Jacobsen Bros., 219 Iowa 483, 258 N. W. 104, and Jordan v. Schantz, 220 Iowa 1251, 1256, 264 N. W. 259, in support of this theory.

These cases support appellants' theory but the fact situations in those cases and in the instant case are entirely different. In those cases, the cars were approaching each other bringing into play the statutory provision requiring vehicles approaching each other to yield one half of the traveled track; whereas, in the instant case, the Glover truck, until he received some signal or acquired knowledge in some way that the truck in the rear desired to pass him, had a right, in proceeding in a general course forward, to make use of the entire pavement where there was no vehicle approaching him. If there was any assumption involved at all, it would be that Simmons should have assumed that Glover would yield part of the highway and perhaps slow down in passing this man Green and, hence, Simmons should not attempt to pass at this particular place.

Appellants also contend that Glover was guilty of contributory negligence as a matter of law and that the trial court should have so found in that he violated section 5021, requiring vehicles to turn to the right when overtaken, sections 5023 and 5024, relating to the failure to observe the signal of the overtaking vehicle, and section 5032, relating to stopping, turning or changing of course. When we take into consideration what the jury was warranted in doing; that Glover swerved to the left in order to pass Green and could not return to the right half of the paving instanter; that he had already swerved to the left over the black line when Simmons undertook to pass and before the horn was sounded, we find that none of these sections have any application. There is no testimony in this case, other than the circumstance that the right rear wheels of the Simmons' truck were out on the shoulder a few inches, that Glover's truck was over the black lines more than eight inches at any time. The rule is that ordinarily the question of contributory negligence is one for the jury and we think the trial court properly submitted this question to the jury in the instant case.

However, if the jury should have arrived at the conclusion or even though the trial court or this court might come to the conclusion that, with the road clear of all vehicles, Glover, at the rate of speed he was already traveling, was guilty of

contributory negligence in slowing down or in slowing down too suddenly, there was still the issue of the last clear chance and, under the evidence, facts and circumstances disclosed by the record, as we have heretofore briefly pointed out, it was a jury question whether Simmons upon discovering Glover's peril in having turned out to the left in the pathway of this heavily loaded truck, should not have pulled farther over to the left onto the shoulder, if need be, to avoid the collision. Simmons admitted on the witness stand that, had he pulled over 18 inches farther, he would have missed the other truck. Of course, under his theory, he was too close, but, under all the evidence, the jury could have found that there was room and time in which, in the exercise of reasonable care and prudence, for Simmons to have avoided the collision and, under this theory, the jury was warranted in finding for the plaintiff regardless of any negligence on the part of plaintiff.

The cases of Spaulding v. Miller, 220 Iowa 1107, 264 N. W. 8, and Hogan v. Nesbit, 216 Iowa 75, 246 N. W. 270, cited and relied upon by appellants on the doctrine of last clear chance correctly state the rule of law but, in both of these cases, the court found that the defendant did not discover plaintiff's peril in time to avoid the collision. In the instant case, we think this was a question for the jury. We have not attempted to traverse every argument presented by appellants but have said enough to indicate our views.

Other assignments of error relate to the instructions given by the court and the failure of the court to properly instruct the jury as to all the grounds of negligence submitted. No instructions were requested. We have carefully considered all these assignments of error and are of the opinion that they are without substantial merit. The instructions, as a whole, were free from ambiguity or complexity and disclose a diligent effort on the part of the trial court to be fair to both parties in the presentation of the issues and the law governing the same .

The record contains no reversible error and the case must, therefore, be and it is affirmed.—Affirmed.

MITCHELL, C. J., and BLISS, STIGER, SAGER, HALE, OLIVER, and MILLER, JJ., concur.

RICHARDS, J., concurs in result.