DELORES OVERTURF, appellee, v. H. L. BERTRAND, appellant.

No. 51274.

(Reported in 128 N.W.2d 182)

MAY 5, 1964.

Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, for appellant.

Wilson, Maley & Stamatelos, of West Des Moines, for appellee.

MOORE, J.—This is a law action to recover for personal injuries sustained in a rear-end collision when plaintiff stopped her vehicle at the intersection of west Eighteenth Street and Grand in Des Moines about 10:30 a.m., September 5, 1961. From a jury verdict and $7500 judgment defendant has appealed.

The intersection where this accident happened is so unusual and complicated that an understandable word description of it is almost impossible. We therefore insert here Exhibit 7 which is a photograph taken from the west looking about due east and from a point above the street level. It was taken when some snow was on the ground and in that respect does not represent the true condition as it existed on September 5. Otherwise it is a fair representation of the scene.

The large building in the upper part of Exhibit 7 is the Meredith plant. It sits about due east and west along the south side of Locust Street a short distance east of Eighteenth Street. The lower right of the photograph shows a small part of the northeast corner of Tech High School. Immediately east and also west of this corner are driveways leading into the school property. The street shown from the lower left curves generally to the southeast and connects Grand Avenue and Locust Street. For convenience it is referred to as Grand Avenue. It is a three-lane one-way street which accommodates traffic from the west toward the business district of Des Moines. Eighteenth Street as it intersects this curving street is divided into two parts to the north but is not so divided to the south. It is wider to the north than to the south of the intersection. North of the intersection

the west edge of the street is farther west than it is south of the intersection. The traffic from the north on Eighteenth Street is required to use the west part of the divided street while the traffic from the south uses the east part. Because of the difference in the width of Eighteenth Street the southbound traffic really must travel southeast while crossing Grand. Parallel to the west edge of Eighteenth Street north of the intersection is a public sidewalk which, from another exhibit, appears to be about 10 feet wide. The marked crosswalk shown near the bottom of Exhibit 7 is not a prolongation of the lateral lines of this sidewalk at the intersection. The shown marked crosswalk is many feet west of the intersection.

The marked crosswalk is 13 feet wide. Its west line is 34 feet from the base of the "Go", "Caution" or "Stop" light pole which is shown near the bottom of Exhibit 7. It is referred to as light No. 2 by the witnesses. That pole is 69 feet 7 inches west of the west edge of Eighteenth Street where it leaves the intersection to the south. Thus it becomes apparent the west edge of the intersection at all points is many feet east of the signal-light pole. A prolongation of the sidewalk lines from the northwest across Grand would result in an unmarked crosswalk several feet east of the pole.

The accident happened when plaintiff stopped her vehicle in the middle lane of Grand even with or a few feet east of this signal-light pole and was struck from the rear by defendant's pickup truck.

Just prior to the accident both vehicles were stopped for a red signal light farther west. Defendant had stopped his pickup truck back of the automobile driven by plaintiff. When that light signaled "Go" plaintiff started her vehicle and traveled southeast on Grand toward the intersection shown in Exhibit 7. Her vehicle was followed by that of the defendant.

Part of plaintiff's testimony is:

"I started from a standing position and I suppose I was going 10 to 15 miles per hour. That intersection is always a confusing one and I never speed through there; I proceed with caution. That intersection is confusing to me. It is a hard one to draw, a hard one to drive through.

"As I rounded the bend coming toward light No. 2 it was green and then it turned to amber and as I got up to it I stopped and when I had completed my stop the light was red. I have no idea about how far away I was when it started to turn to red but I wasn't past it at that time. I was coming up to it when it turned red. I have no idea about how far away I was. The car was moving, I was stopping, obeying the traffic signals. At the time the light turned to yellow I think I was going 10 to 15 miles per hour I suppose, I don't remember. I wasn't watching my speedometer. As soon as the light turned to yellow I began appying my brakes. I stopped at a point close to or adjacent to light No. 2.

"I was just stopped a matter of seconds before the impact. I had come to a total stop. The impact occurred within seconds after I had come to a complete stop. I was sitting there with the brake on. I am sure that the car moved some after the impact but I don't know how far it moved. All of a sudden I was out of the car looking around to see what happened."

Part of defendant's direct testimony is:

"As we left stoplight No. 1 and began to proceed east and then southeast Mrs. Overturf's car was directly ahead of me. There was approximately a car or a car and a half length between our vehicles. Mrs. Overturf and I had maintained approximately the same speed on the way from 31st and Grand. The distance between our cars remained about the same during the entire trip. I was going approximately 20 miles per hour when I went around this curve.

"After we left stoplight No. 1 we went due east and then southeast and I was directly behind her following in the center lane and as we approached the lights at the time I entered the crosswalk it was green. It had been green for Mrs. Overturf ahead of me also. I am not referring to stoplight No. 2. Then all of a sudden I saw the stoplights come on on her car, I slammed on my brakes and slid into the rear of her car. * * *

"The point of impact was about 25 feet away from the crosswalk which would put it past the location of stoplight No. 2. By past I mean south or southeast of it.

"Mrs. Overturf stopped her car quite suddenly because all

I had a chance to do was the minute I saw the brake lights come on was to hit my brakes."

On cross-examination defendant stated:

"I noticed the stoplights on the Overturf car go on after the light turned to yellow. I saw the light turn yellow first and saw the stoplights on the Overturf car. At this time I was just through the crosswalk. It just all happened in a split second. At that time I applied my brakes. I applied my brakes when I saw Mrs. Overturf's stoplights come on because we were in the intersection approaching through or clear of the intersection. * * * When I applied my brakes the tires screamed a bit. When Mrs. Overturf stopped I did not notice any tire scream because I probably couldn't hear hers for mine that were screeching. * * * I do know that I was far enough through the crosswalk that I couldn't stop when I saw the stoplight come on. At the time I saw the red light my car was so far through the crosswalk that I couldn't get it stopped in that car length. I don't know if it was completely or not completely through the crosswalk. My truck is 18 to 20 feet long. I was going 20 miles per hour at the time I first applied the brakes. I thought I saw the stoplight turn yellow before the impact. I know definitely I saw the stoplight on her car come on. I think that I saw the stoplight turn yellow and I did see the stoplights on her car go on.

"It is my testimony that the front end of my car contacted the rear end of her car about 7 feet south of the stoplight. At the time of the impact my car was very close to being stopped."

After the collision plaintiff's vehicle did not interfere with the southbound traffic on Eighteenth Street. Shortly thereafter both vehicles were driven into the driveway just east of signal light No. 2.

John J. McFall, a passenger in defendant's pickup, testified substantially the same as defendant. Part of his testimony is:

"At the time the light changed to amber I did see we were onto the crosswalk or passing over it. With respect to the car ahead of us, all I could see was that it had stopped. The car ahead of us stopped just as the light went to yellow. * * * The point of impact was southeast of the crosswalk. We were completely through the crosswalk when the impact occurred so we

would be at least the length of his truck through the crosswalk. I believe we may have been even farther than that. I don't remember exactly how far but we were well through the crosswalk."

I. Defendant's first assignment of error is that the trial court erred in overruling his motion for a directed verdict made at the close of plaintiff's case in chief and renewed at the close of the evidence. He contends plaintiff was guilty of contributory negligence as a matter of law by stopping after she had started through the marked crosswalk.

Code section 321.257, so far as material here, provides:

"Traffic-control signal legend. Whenever traffic is controlled by traffic-control signals exhibiting the words 'Go', 'Caution' or 'Stop' or exhibiting different colored lights successively one at a time the following colors only shall be used and said terms and lights shall indicate as follows:

"1. Green alone or 'Go'.

"Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection at the time such signal is exhibited. * * *

"2. Yellow alone or 'Caution' when shown following the green or 'Go' signal.

"Vehicular traffic facing the signal shall stop before entering the nearest crosswalk at the intersection, but if such stop cannot be made in safety a vehicle may be driven cautiously through the intersection. * * *

"3. Red alone or 'Stop'.

"Vehicular traffic facing the signal shall stop before entering the nearest crosswalk at an intersection or at such other point as may be indicated by a clearly visible line and shall remain standing until green or 'Go' is shown alone. * * *."

The use of "nearest crosswalk at an intersection" necessarily leads us to the statutory definitions of "crosswalk" and "intersection".

Code section 321.1 provides:

"Definition of words and phrases. The following words and

phrases when used in this chapter shall, for the purpose of this chapter, have the meanings respectively ascribed to them. * * *

"54. 'Intersection' means the area embraced within the prolongation or connection of the lateral curb lines, or, if none, then the lateral boundary lines of the roadways of two highways which join one another at, or approximately at, right angles, or the area within which vehicles traveling upon different highways joining at any other angle may come in conflict.

"55. 'Crosswalk' means that portion of a roadway ordinarily included within the prolongation or connection of the lateral lines of sidewalks at intersections, or,

"Any portion of a roadway distinctly indicated for pedestrian crossing by lines or other markings on the surface."

██ ██ These statutes are clear that not all crosswalks are at the intersection such as to require stopping for a yellow or red light. The marked crosswalk west of the intersection here is not "at the intersection". To hold otherwise might well require stopping at a marked crosswalk as much as a half block from the intersection. Here the crosswalk at the intersection was that area within the prolongation of the lateral lines of the sidewalk running parallel to Eighteenth Street north of Grand. That area within the prolongation is east of where plaintiff stopped her vehicle even under defendant's testimony.

No citation of authority is needed for the propositions that in considering the propriety of a directed verdict for defendant the court gives plaintiff's evidence the most favorable construction it will reasonably bear and that generally the question of contributory negligence is for the jury. It is only in exceptional cases that it may be decided as a matter of law. See rule 344 (f)2 and 10, Rules of Civil Procedure.

We agree with the trial court's ruling that the question of plaintiff's freedom from contributory negligence was for the jury.

II. In his second assignment of error defendant contends the trial court should have given detailed instructions on a driver's duties imposed under Code section 321.257 and that he was entitled to an instruction on sudden emergency. The real thrust of his argument is that plaintiff had no right to stop after she

started through the marked crosswalk. We have already answered this contention.

Instruction No. 4 as one of the necessary elements of plaintiff's case required proof by a preponderance of the evidence she was not guilty of any negligence which in anyway or in any manner directly contributed to the accident. Instruction No. 5 defined contributory negligence and advised the jury any such negligence would bar recovery by plaintiff.

We have frequently said it is the trial court's duty to instruct on all issues raised by the pleadings and evidence and to see that the jury has a clear and intelligent understanding of what it is to decide. Gardner v. Johnson, 231 Iowa 1233, 1236, 3 N.W.2d 606, 608, and citations; Harrington v. Fortman, 233 Iowa 92, 100, 8 N.W.2d 713, 717, and citations; Ritter v. Andrews Concrete Products & Supply Co., 250 Iowa 297, 300, 93 N.W.2d 787, 789.

Here it was the duty of plaintiff both before and after the yellow light came on to exercise reasonable care under the circumstances. We believe the instructions sufficiently apply the law to the facts. Our attention has not been called to any prejudice to defendant as a result of the court's failure to instruct in greater detail.

III. Defendant next argues the trial court erred in refusing to give a sudden emergency instruction. As he does throughout, defendant assumes plaintiff was required to stop before entering the marked crosswalk or to continue through the entire intersection without stopping. As we have pointed out, such an assumption is erroneous.

We have frequently said a defendant may offer evidence of a legal excuse for his violation of the rules of the road as charged by plaintiff. In Kisling v. Thierman, 214 Iowa 911, 916, 243 N.W. 552, 554, our most cited case in this area, we said: "By the term 'legal excuse' is meant: * * * 3. Where the driver of the car is confronted by an emergency not of his own making, and by reason thereof he fails to obey the statute. * * *."

We have recently reviewed the rule and particularly the necessary element of "not of his own making" in Winter v. Moore, 255 Iowa 1, 8, 121 N.W.2d 82, 86, and Mass v. Mesic,

256 Iowa 252, 255, 127 N.W. 2d 99, 101, and will not unduly extend this opinion by a prolonged discussion of the rule.

██ ██ Of course, one who claims excuse on the ground of sudden emergency not created by his own act has the burden to prove it. Pinckney v. Watkinson, 254 Iowa 144, 151, 116 N.W.2d 258, 262, and citations. See McMaster v. Hutchins, 255 Iowa 39, 120 N.W.2d 509, 511–513. We hold defendant here failed to carry his burden, and the trial court properly refused to instruct on sudden emergency.

██ In Young v. Hendricks, 226 Iowa 211, 215, 283 N.W. 895, 898, we said: "An emergency has been variously defined as (1) an unforeseen combination of circumstances which calls for immediate action; (2) a perplexing contingency or complication of circumstances; (3) a sudden or unexpected occasion for action; exigency; pressing necessity."

We have stated many times there is an emergency in every collision of motor vehicles. But the emergency which excuses a violation of a statute must be one to which the violator did not contribute; it must be one "not of his own making". Wachter v. McCuen, 250 Iowa 820, 827, 96 N.W.2d 597, 600, and citations; Mass v. Mesic, supra.

Defendant had formerly worked near this intersection. He was familiar with "the location of the various things around there". The traffic light changes followed by the stopping or changing of the traffic flow near and through the intersection were not unexpected or unforeseen by him. In fact, it was his duty to anticipate such changes as he approached the intersection.

In 7 Am. Jur.2d, Automobiles and Highway Traffic, section 195, it is said:

"As a rule, motorists approaching an intersection in the face of a green traffic light may proceed, although when they are approaching from some distance away they are required to anticipate that the signal will change, and under certain circumstances may be under the affirmative duty of reducing their speed."

See also section 360; Luther v. Jones, 220 Iowa 95, 261 N.W. 817; Glover v. Vernon, 226 Iowa 1089, 285 N.W. 652.

In Harris v. Clark, 251 Iowa 807, 815, 103 N.W.2d 215, 220, we said:

"In the cases denying the benefit of the emergency rule the party claiming the benefit has either had actual knowledge of a dangerous situation or in the exercise of reasonable care could have had such knowledge in time to act in relation thereto."

Defendant relies heavily on Harris v. Clark, supra, where defendant's station wagon struck the rear of plaintiff's vehicle as it stopped to allow an automobile preceding plaintiff to turn right into a private driveway. It is not factually in point. The accident in Harris v. Clark happened between intersections where defendant had no actual knowledge of any dangerous condition or reason to anticipate plaintiff would stop suddenly. He was not aware of the car ahead which was attempting to turn. Defendant here had actual knowledge of the dangerous situation as he approached the intersection closely following plaintiff's vehicle without reducing his speed. His own failure to exercise reasonable care under the circumstances contributed to the cause of the emergency.—Affirmed.

All JUSTICES concur.