Betty BANNON, Administrator of the
Estate of Gail A. Ward,
Deceased, Appellant,

v.

Francis X. PFIFFNER, Executor of the
Estate of Ann Frances Pfiffner,
Deceased, Appellee.

No. 67903.

Supreme Court of Iowa.

April 20, 1983.

Donald R. Breitbach and Randal J. Nigg of Reynolds, Kenline, Breitbach, McCarthy, Clemens, McKay & Nigg, Dubuque, for appellant.

Michael J. Coyle of Fuerste, Carew, Coyle, Juergens & Sudmeier, Dubuque, for appellee.

Considered by UHLENHOPP, P.J., HARRIS, McGIVERIN, and CARTER, JJ., and LeGRAND, Senior Judge.

UHLENHOPP, Justice.

This appeal involving a collision of two cars turns on whether a fact issue was generated on the existence of a sudden emergency.

The jury could find the facts to be as follows. A valley, slightly over a half-mile in breadth, lies between two low hills on United States Highway 20 near Raymond, Iowa, east of Waterloo. Early on the afternoon of January 4, 1980, freezing rain began to fall and the highway became "kind of slushy and crunchy."

At about 4:45 p.m., Gail A. Ward was driving west across the valley on her right side of the highway. Four cars were proceeding east: a van in the lead, then a car driven by Ann Francis Pfiffner, followed by the car of Jeffrey Cross and his brother, and finally the car of Leonard Cameron and his wife. These four vehicles were traveling at about 40 to 45 miles per hour on their right side of the highway, and were maintaining about the same distances apart.

The eastbound cars had encountered no sliding to this point. As they traversed the crest of the west hill and proceeded east into the valley, the van went onto the right shoulder two or three times. The brake lights on Pfiffner's car then went on, and that car slid left across the paving and head-on into the oncoming Ward car, killing Pfiffner and Ward. The van, farther east, went on. Cross, to the west, was able to get his car onto the graveled right shoulder; he drove past the collision site and stopped. Cameron, behind Cross, was also able to get onto the shoulder; he stopped at or near the collision site.

A deputy sheriff heard "CB chatter" about the wreck and also received an official call. He arrived very shortly from the west.

Three principal witnesses testified as to the condition of the highway: the deputy, Cross, and Cameron. Since the appeal turns on the sufficiency of evidence, we quote illustrative excerpts from their testimony. The deputy testified:

Q. And about how long had that weather been going on that day prior to the accident as best you can tell us? A. I don't know how long it had been raining, but turning to freezing rain it had been a short time, maybe probably started turning to freezing rain a half hour or so before the accident.

Q. What was the state of Highway 20 as you went to the accident scene? Tell us what you noticed as you drove your squad car? A. It was ice covered. Speed had to be reduced considerably. The traction was very, very poor.

. . . .

Q. If you can recall, how long before the accident had the weather been inclement, had it been either raining or sleeting or snowing or whatever had been going on? A. Well, the conditions of the roadway began to get increasingly worse as I came on duty at 4 p.m., and by 4:30, twenty to five, somewhere in there, the road had become completely iced up.

Q. I take it then that for some considerable time before the accident there had either been some snow or rain that day? A. Freezing rain.

Q. When you came on the scene, were you able to negotiate your patrol car at a safe speed and get stopped without any problems? A. Yes.

. . . .

Q. Can you recall the condition of the roadway, the Highway 20 roadway, as you traveled at that time? A. It was becoming increasingly worse.

Q. By worse, you mean what? A. It was becoming slipperier. The ice was beginning to build up on the roads.

Q. Do you recall your speed as you traveled along Highway 20 at that time? A. I know it wasn't the speed limit. I'd have to assume it was probably 40, 45.

. . . .

Q. Do I correctly understand that from the time that you left Highway 20 travelling three-quarters of a mile north and then hearing the CB chatter and turned back, that in that space of time, the condition of the roads had markedly worsened? A. No. The way I understood your question before was after leaving town and getting out into the country, you know, which would have taken about another ten minutes or so, that they had begun to be worse.

Q. They were deteriorating rapidly? A. Yes.

. . . .

Q. Do you have any recollection as to the temperature at the time of your travelling along Highway 20? Any radio reports or did you check the temperature when you came on duty or anything of that sort? A. All I can say is it was around freezing. I don't know the exact temperature, no.

Cross testified:

Q. Do you recall the weather as you left Waterloo? A. When we left Waterloo it was freezing rain. It was becoming kind of snowy.

Q. Was it a heavy snow, light snow? A. No, it wasn't.

Q. A light snow and freezing rain as you recall? A. Yes.

. . . .

Q. Do you recall what speed you were travelling; let's begin as you were leaving the Waterloo area? A. Well to leave my house you go right out on a four-lane highway, and I was probably doing the speed limit, 55, and then right outside of Raymond, the four lane becomes—they merge into two-lane traffic, and there I was probably going between 45 and 50. I had decreased my speed.

Q. And at the time you observed the accident that you observed, how fast were you going, if you recall? A. I'd say 45 to 50.

Q. What about the other traffic that you described; how fast was it going in your lane of travel eastbound? A. We

were in a group of four cars, as I remember, and we were all pretty consistent with the same distance between all the cars. So, I would say we were all probably going within the same speed because nobody was gaining on nobody else.

. . . .

Q. Could you tell us then again, in your own words, what you observed in the seconds or minutes immediately preceding the collision that you observed? A. We come around that curve, and we got to the brink of the hill; and when we got to the top of the hill, my brother had noticed the van ahead of the Pfiffner vehicle had went over on the gravel, the shoulder, and came back. And then he did it again and came back, and we were wondering what he was doing it for.

. . . .

Q. And it was at the time the van was coming back on the road the second time that you also observed the Pfiffner vehicle begin to slide? A. When I noticed her, I was watching the van come back on the road, and I saw her taillights go on, and that's when she must have hit an icy spot, went out; and then my brother said, "We are going to get hit," and she hit. The accident occurred; and at about the same time I went over on the gravel and we just drove clear of the accident; and they stayed right in the other lane.

Cross estimated the distance from the west hill to the collision, and testified further:

Q. And that's from the crest of the hill to the point of collision? A. Uh-huh. That's where it seemed to get really icy. The conditions to that point didn't seem that bad until you got to the top of the hill and then it just got really slick. I mean, just like glare ice, because I recall when I ran back and yelled at Mrs. Cameron if it was bad, and she said it was real bad; and I tried to change direction, and I slid on my feet. I had tennis shoes on at the time, and I would say I slid about five feet trying to just stop to change directions. That's how slippery it was.

. . . .

Q. Do you recall the condition of the roadway at the crest of the hill? A. It was kind of slushy, and then all of a sudden it seemed to be just glare ice.

Q. When you say, "all of a sudden," at what point? A. Well, it came to the top of the hill. Say I'm at the top of the hill right here. When I started gradually down, it seemed to just get real glary ice from my headlights and from the van going over. Like I would go by there a lot, and I notice the hills go like this. It seems like the wind comes through there a lot harder than at any place else because it's just an incline like. So, it seems to just make that spot—I can see why that spot would be a lot worse.

. . . .

Q. Would this line here [on exhibit] indicate the top of that hill or the hill crest we are talking about? A. Yes. That's where I remember seeing the van for the first time, and I had noticed that the road condition had turned kind of slushy before that point to just glare ice.

Q. So you are telling the jury here from clear back at Waterloo up until the hill crest, all that way you had pretty slushy roads? A. Yes.

Q. And you were able to drive 50 miles an hour? A. 45 to 50.

Q. Okay. 45 to 50. A. Yes.

. . . .

Q. So, the van, from the hill crest to where the accident happened down by the Ordway Road on Highway 20, in that distance, this van went off the road two times? A. Yes.

Q. And that's the same spot where it got lots worse, isn't it? A. Yes.

Q. Were you surprised that it was this slippery over here, sir? A. Yes, I was.

Cameron testified:

Q. Did you expect that you might run into portions of the highway that would be slippery as you were travelling along, or not? A. Well, not like that.

Q. But, did you, as a prudent driver on this day, feel you could run into portions of the highway that would be difficult to go over? A. You reduce speed, right.

. . . .

Q. Now, we have been given the line up of the cars that were travelling east away from Waterloo. Do you agree that the first vehicle that you remember seeing was the van? A. Yes, and I saw it going off on the highway, and I couldn't figure out what was going on either.

. . . .

Q. Do you know what your rate of speed was as you were following these cars ahead of you and travelling east on No. 20? A. 40 to 45 miles an hour.

Q. Did you feel at that time that you had any problem controlling your vehicle? A. No.

. . . .

Q. What did you do when you brought your car to a stop? Explain to the jury what you did. A. Got out and pretty near fell down. It was so slick. My wife and I couldn't hardly walk across the road to get to the two vehicles. I went to Mrs. Pfiffner; my wife went to Miss Ward.

. . . .

Q. Do I understand that as near as I could write it, you were asked if you expected that you were going to have some slippery portions of the highway, and you answered, "Yes, but not that slippery"? A. Yes, sir. It was kind of slushy and crunchy.

Q. We have talked about this hill crest up here on the board. If we draw a little larger scale like and say that Waterloo is still back over on this side and the hill crest is here and Independence is on that side, are we to have the jury understand, sir, from your testimony, that anything that was on this side of the hill crest back toward Waterloo wasn't that big of a problem? A. No, sir, but, when we came over the hill, it was a dramatic change.

Q. It was a dramatic change? A. Right.

Q. And it was a change for the worse? A. Right.

Q. It was slipperier? A. Right.

Q. It was more hazardous? A. Yes.

Q. Unusually so? A. Much so.

Q. Even more slippery and hazardous than you expected in driving under these generally poor conditions? A. Yes, sir.

Q. Were you surprised? A. Shock, right; very surprised.

Q. That van going off the road two or three times, were you worried about that? A. Well, to tell you, we were still—I had just come up on the top of the hill there and I couldn't figure out what was the matter with him because that didn't even enter my head that it was slick, really. And I couldn't figure out what was the matter; whether he had a blow-out and was weaving back and forth or what was going on.

Q. He was sure doing something out of the ordinary? A. Right.

. . . .

Q. What did you have to do in order to walk on that surface of the roadway to get over to the cars after this wreck? A. Well, I presume they have, living in Iowa, they have all walked on ice. You walk real carefully. It was just like glass. It was a very dramatic change from what the road had been up to that hill.

Q. Very dramatic change, meaning it was a lot— A. Worse.

Q. —worse? A. Yes.

Q. You hadn't encountered anything like that all the way from Waterloo? A. No, sir. It was slush and kind of, well, freezing slush, how it gets crunchy-like.

Q. You are all driving a little less than the speed limit? A. Yes, sir.

Q. And all about the same speed? A. We were all staying about the same.

Q. And nobody was going off the road on the Waterloo side of the hill crest? A. No, sir.

. . . .

Q. On January 4, 1980, if I understand you, even though you are a prudent and careful driver and would expect in Iowa some slippery portions of the highway, when you got to this slippery portion, you were shocked? A. Right. If I would have expected anything like that, I would have been going a lot slower.

Q. You had no reason to expect anything like that, I take it? A. No, sir.

At the conclusion of the evidence plaintiff moved for a directed verdict in her favor on the ground that Pfiffner was negligent as a matter of law. The trial court overruled the motion. Over plaintiff's objection, the trial court in its instructions submitted to the jury the issue of whether Pfiffner was confronted with a sudden emergency not of her own making.

The jury found for defendant, the trial court dismissed the petition, and plaintiff appealed. We transferred the appeal to the Court of Appeals, which held that Pfiffner was negligent as a matter of law and remanded the case to district court for trial on damages. We then granted defendant's application for further review.

The appeal involves three legal questions: does substantial evidence appear (1) that Pfiffner was confronted with an emergency? (2) that the emergency was not of her own making? and (3) that she acted as a reasonably prudent person in the emergency?

■ Violation of a statutory rule of the road constitutes negligence in itself under the venerable *Kisling v. Thierman,* 214 Iowa 911, 915, 243 N.W. 552, 554 (1932). Formerly an exception existed when a car failed to yield half of the road by turning to the right in a meeting situation in a rural area; that was regarded as prima facie negligence. *Hedges v. Conder,* 166 N.W.2d 844, 850 (Iowa 1969). In cities, however, the statute at the time required driving on the right side, and driving on the left side fell under the general rule of negligence per se. *Winter v. Davis,* 217 Iowa 424, 435, 251 N.W. 770, 774–75 (1933). *See also France v. Benter,* 256 Iowa 534, 542, 128 N.W.2d 268, 272–73 (1964).

■ The statute regarding rural areas has been changed to provide in section 321.-297 of the Iowa Code (1981):

A vehicle shall be driven upon the right half of the roadway upon all roadways of sufficient width except as follows:

*a.* When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement.

*b.* When an obstruction exists making it necessary to drive to the left of the center of the roadway, provided, any person so doing shall yield the right of way to all vehicles traveling in the proper direction upon the unobstructed portion of the roadway within such distance as to constitute an immediate hazard.

*c.* Upon a roadway divided into three marked lanes for traffic under the rules applicable thereon.

*d.* Upon a roadway restricted to one-way traffic.

. . . .

As a result of this statute, driving on the left as Pfiffner did, in situations other than the statutory exceptions, is negligence per se in rural areas the same as on city streets.

■ *Kisling* also held, however, that a violation of a statutory rule of the road may be legally excused in four situations, one of which is when the driver "is confronted by an emergency not of his own making, and by reason thereof he fails to obey the statute." 214 Iowa at 916, 243 N.W. at 554. Defendant claims that Pfiffner's suddenly coming upon the icy area constituted an emergency, not of her own making, and by reason of the emergency her car went into Ward's path.

■ Defendant had the burden of proving that Pfiffner was legally excused by virtue of the emergency. *Overturf v. Bertrand,* 256 Iowa 596, 605, 128 N.W.2d 182, 187 (1964). In considering plaintiff's motion to direct a verdict against defendant and plaintiff's objection to the emergency instruction, we therefore view the evidence in the light most favorable to defendant. *Beitz v. Horak,* 271 N.W.2d 755, 757 (Iowa 1978); *McCaull v. Universal Manufacturing Co.,* 218 N.W.2d 592, 593 (Iowa 1974).

■ I. *Sudden emergency?* In the present context, two main situations may exist with respect to icy highways. In one situation the icy condition is general, and

the driver must be taken as being aware of it. If such a driver proceeds in normal fashion notwithstanding the ice and eventually slides on a patch of it, he cannot set up the icy condition as an "emergency." An emergency requires "an unforseen combination of circumstances" but the element of unforeseeability is missing. See definition of emergency in *Webster's Third New International Dictionary* (1969). Such is the case of *Boge v. Jack Link Truck Line, Inc.,* 200 N.W.2d 544 (Iowa 1972).

In the other situation, although the weather may be inclement, ice has not formed so far as the driver reasonably observes. He proceeds in accordance with conditions as they appear. Suddenly he encounters an unanticipated patch of ice and slides. Normally in this situation the driver may rightly claim that the decision on whether the ice was reasonably foreseeable is for the jury to make. *Zell v. Luthy,* 216 Kan. 697, 702, 533 P.2d 1298, 1303 (1975); *Byrnes v. St. Louis County,* 295 N.W.2d 517, 519–20 (Minn.1980); *Hughes v. Keller,* 302 Minn. 8, 14, 224 N.W.2d 738, 741 (1974); *Emerson v. Eystad,* 288 Minn. 401, 408, 181 N.W.2d 337, 339 (1970); *Smith v. Bullington,* 499 S.W.2d 649, 656 (Tenn.App. 1973); *Whitley v. Patterson,* 204 Va. 36, 39, 129 S.E.2d 19, 21 (1963); *see Hunt v. State,* 252 N.W.2d 715, 717 (Iowa 1977); *Pullen v. Fagen,* 204 Va. 601, 605, 132 S.E.2d 718, 721 (1963).

From our review of the record, we conclude that the second situation is the one we have here. The jury could find that Pfiffner was confronted with a sudden emergency.

II. *Of Pfiffner's own making?* On a related issue, plaintiff contends that Pfiffner made her own emergency. If a person tortiously brings about an emergency, he cannot rely on it as an excuse for resulting harm although he conducts himself properly in the emergency itself. As stated by the American Law Institute:

Where the emergency itself has been created by the actor's own negligence or other tortious conduct, the fact that he

has then behaved in a manner entirely reasonable in the light of the situation with which he is confronted does not insulate his liability for his prior conduct. Such liability is not precluded by the fact that he has acted reasonably in the crisis which he has himself brought about. It is not his reasonable conduct in the emergency which makes him liable, but his prior tortious conduct creating the emergency.

*Restatement (Second) of Torts* § 296, Comment *d* (1977).

This contention of plaintiff is intertwined with the first one. Whether Pfiffner and the other three drivers in the train of cars should have anticipated an icy area prior to arriving there, whether they should have driven slower, and whether they should have been more watchful and maintained closer control over their vehicles are all questions of reasonableness, not questions with black or white answers. We have said that such questions are particularly adapted to jury consideration, rather than to determination by the judge. *Johnson v. Svoboda,* 260 N.W.2d 530, 535 (Iowa 1977).

We hold on this record that the question of whether Pfiffner negligently produced the emergency was one of fact.

III. *Due care in the emergency?* Assuming that Pfiffner was confronted with an emergency and that it was not of her own making, she was not completely absolved from the exercise of care; the law required her to conduct herself as a reasonably prudent person *in a similar emergency.* The Institute states regarding this aspect of the emergency rule:

Among the circumstances which must be taken into account is the fact that the actor is confronted with such an emergency as is described in this Section. The law does not require of the actor more than it is reasonable to expect of him under the circumstances which surround him. Therefore, the court and jury in determining the propriety of the actor's conduct must take into account the fact that he is in a position where he must

make a speedy decision between alternative courses of action, and that, therefore, he has no time to make an accurate forecast as to the effect of his choice. The mere fact that his choice is unfortunate does not make it improper even though it is one which the actor should not have made had he had sufficient time to consider all the effects likely to follow his action.

*Restatement (Second) of Torts* § 296, Comment *b* (1977).

■ The jury could find that the collision happened very quickly after the cars got on the ice. The evidence is sketchy because of the shortness of the time and the two fatalities in the tragedy. It does show that Pfiffner's brake lights flashed on. Perhaps Pfiffner would have stayed on her own side if she had not applied her brakes, but whether this showed lack of reasonable care, under the circumstances, was for the jury to say. *Kight v. Murdock,* 253 Miss. 572, 576, 176 So.2d 320, 321 (1965); *State v. Hogback Mountain Ski Lift, Inc.,* 122 Vt. 8, 11, 163 A.2d 851, 854 (1960); *Meador v. Lawson,* 214 Va. 759, 762, 204 S.E.2d 285, 288 (1974); *Whitley v. Patterson,* 204 Va. 36, 39, 129 S.E.2d 19, 21 (1963).

After reviewing the evidence, the trial court aptly stated in this case:

Plaintiff protests that Defendant's decedent had an estimated distance of 100 feet in which to adjust for a newly encountered condition which surprised other witnesses. At 45 miles per hour, the Decedent's vehicle was traveling 66 feet each second and consequently the time lapse to cover 100 feet was approximately 1 and ½ seconds. Whether the time lag of 1 and ½ seconds in which to respond to the newly discovered problem is reasonable appears to be a jury question.

■ A similar situation involving a very short period of time existed in *Murray v. Lang,* 252 Iowa 260, 106 N.W.2d 643 (1960). This court held that determination of whether the actor's conduct in the emergency was reasonable was properly left to the jury. *Id.* at 264, 106 N.W.2d at 645. We so hold here.

We uphold the judgment of the district court.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.