Keel PETERSON and Linda Peterson,
Appellants/Cross-Appellees,

v.

FIRST NATIONAL BANK OF IOWA,
Appellee/Cross-Appellant.

No. 85–14.

Court of Appeals of Iowa.

June 4, 1986.

Peter C. Riley of Tom Riley Law Firm, P.C., Cedar Rapids, for appellants/cross-appellees.

Robert Tilden, Roger Stone of Simmons, Perrine, Albright & Ellwood, and David McManus of Olinger & McManus, Cedar Rapids, for appellee/cross-appellant.

Heard by DONIELSON, P.J., and SNELL and SCHLEGEL, JJ.

DONIELSON, Presiding Judge.

Plaintiffs appeal and defendant cross-appeals from the order granting a new trial in an action for intentional interference with existing and prospective contracts and breach of an oral contract.

Plaintiffs, Keel and Linda Peterson, farmed two rental properties (Staskal Farm of at least 580 acres and Caraway Farm of 550 acres) and a tract that he and his sister owned (Home Farm of 160 acres). Defendant, First National Bank of Iowa, extended him approximately $300,000 in 1982, which was intended to be the maximum loan amount for his farming operation in addition to a carryover debt of $45,000 from 1981. The bank held a security interest in his crops and equipment. Peterson apparently spent all of these funds and was unable to pay the Caraway Farm rent when it was due in September of 1982. Keel Peterson executed a promissory note with the bank on September 27, 1982, in the amount of $40,000 to pay the Caraway Farm rent. This note was due on March

17, 1983. At this point, Peterson owed the bank approximately $430,000.

On November 1, 1982, the rent for the Staskal Farm was due. Petersons did not have sufficient funds to pay this rent. The Petersons decided to borrow money from the Commodity Credit Corporation (CCC), a reserve program sponsored by the United States Department of Agriculture through the Agricultural Stabilization and Conservation Service (ASCS), and use his harvested 1982 crops as collateral. On November 23, 1982, the Petersons obtained a lien waiver, required for participation in the CCC program, from the owner of one of the rental properties, Everett Staskal, who also owned the elevator in which Peterson stored his grain.

Keel Peterson met with Craig Symons, a bank officer, regarding his financial situation. It is disputed whether Symons promised to loan Petersons money to pay the Staskal Farm rent in return for the CCC proceeds. In any event, Keel Peterson subsequently tendered to Staskal, his landlord, a check in the amount of $49,675 for fall rent which had been due since November 1, and he apparently told Staskal that it could not be cashed until the proceeds were received from the CCC. Staskal attempted to cash the check on December 1, 1982, but the bank refused to honor the check because the CCC proceeds were not in Petersons' account. On the morning of December 6, 1982, Staskal had a conversation with Symons, the substance of which was disputed because Staskal died a month later. Later that day, Keel Peterson deposited four checks which listed Keel Peterson and the bank as joint payees totalling $220,438.93, and two checks which listed only Keel Peterson as a payee totalling $19,836.87 in the bank. After applying the $240,275.80 towards existing debt, Petersons still owed $191,000 according to the bank. The record indicates Keel Peterson executed three other promissory notes with the bank: on June 30, 1982, a note was executed in the amount of $55,000, which was due on December 30, 1982; on September 17, 1982, a note was executed in the amount of $143,178.06, which was due on

March 17, 1983; and on December 6, 1982, a note was executed in the amount of $6,282.16, which was due on March 17, 1983. On the afternoon of December 6, the bank refused to extend Keel Peterson a loan to cover the check held by Staskal.

On December 14, 1982, Staskal filed a lawsuit naming Keel Peterson and the bank as defendants. As a result of failure to pay the rental debt represented by the check, Keel Peterson's lease of the Staskal Farm was terminated in February of 1983. Lack of money prevented Keel Peterson from renting other farm property and one attempt to arrange a loan from another bank was unsuccessful. Keel Peterson and his wife then commenced an action against the bank on theories of intentional interference with existing and prospective contracts and breach of an oral promise to lend the money needed for payment of the rent that he owed. The bank counterclaimed for judgment upon the loans that had been extended to both plaintiffs.

At trial, Keel Peterson testified that Craig Symons had on more than one occasion assured him that a loan for payment of rent would be forthcoming. The officer initially denied making such assurances, either to Peterson or Staskal. Symons' trial testimony on this point went as follows:

Q. (Mr. Riley) Is there any—You have no uncertainty sitting here today as to that conversation, no uncertainty that you told Mr. Staskal that the bank was going to take the entire proceeds of the checks Mr. Peterson was bringing in even though you knew of this claim for fall rent? A. (Mr. Symons) Yeah, I believe we told him that we would be taking the entire proceeds.

Q. Well, you're saying you believe you told him that. Do you remember what your conversation was? A. Not exactly.

Q. All right. Is it possible he could have been led to believe that he would get his money out of that? A. It's possible.

Thus, the officer conceded that he may have left Staskal with the impression that he would be paid out of CCC proceeds during a conversation on the morning of the day that the CCC proceeds were received. Shortly after such conversation, Staskal, an experienced elevator operator who knew the importance of liens and other priority matters, prepared a letter releasing his warehouseman's lien in the manner required before the CCC would release grain proceeds to Keel Peterson. Staskal died approximately a month later.

The Petersons presented evidence concerning emotional distress that he experienced and presented evidence concerning profits that he would have made after 1982 through, inter alia, participation in the United States Department of Agriculture's Payment-in-Kind (PIK) Program if he had been able to continue his farming operation as he had before. The jury returned a verdict for the Petersons in the amount of $400,000 in actual damages and $150,000 in punitive damages. A verdict was returned for the bank upon its counter-claim in the amount of $206,769.21.

The bank filed a motion for new trial raising fifty-one grounds including, inter alia, that the verdict failed to effectuate substantial justice. The trial court granted a new trial solely on the ground that three instructions failed to adequately state that the tort of intentional interference with a prospective contract required proof that the bank acted with improper purpose or by improper means to destroy or injure Petersons' business. The instructions regarding the tort of intentional interference with a prospective contract were submitted to the jury in a form similar to the proposed instructions requested by the bank. The bank's sole objection to such instructions was limited to the theory that the evidence was insufficient to support submitting the issue to the jury.

The Petersons assert that the bank's motion for new trial should not have been sustained because an issue regarding such instructions was raised for the first time in the motion for new trial and that any error

in instruction was harmless and/or invited on cross-appeal. On cross-appeal, the bank asserts: (1) that the evidence was in any event insufficient to support the jury's verdict with regard to issues of both liability and certain elements of damage, and that certain issues should not have been submitted to the jury; (2) that the evidence was sufficient as a matter of law to establish the affirmative defense of justification; (3) that the evidence was insufficient to support the manner in which the court instructed on consideration; (4) that an instruction on contract theories misstated the record; (5) that the evidence was insufficient to support the manner in which the jury was instructed on damages and that an instruction on the new business rule should have been given; (6) that the jury was erroneously instructed in a manner permitting an award of emotional distress damages for breach of contract; (7) that the evidence was insufficient to support submitting the issue of punitive damages to the jury and, in any event, the jury's damage award was excessive; and (8) that judgment on its counterclaim should be entered. In reply Petersons basically assert that error was not preserved with regard to certain issues and arguments raised on cross-appeal and that certain errors assigned on appeal were harmless assuming, *arguendo*, that error occurred.

### I. Appeal Regarding New Trial.

█ The initial issue we address is whether the trial court erred in granting a new trial because the instructions as submitted to the jury did not properly state the law in Iowa on the tort of interference with prospective contractual relations.

Iowa law provides:

In ruling upon motions for new trial the trial court has a broad but not unlimited discretion in determining whether the verdict effectuates substantial justice.

Iowa R.App.P. 14(f)(3). It is also clear that we are more reluctant to interfere with the grant of a new trial than with its denial. Iowa R.App.P. 14(f)(4).

In *Erickson v. Thompson*, 257 Iowa 781, 785–86, 135 N.W.2d 107, 109–10 (1965), the

court held that even though the plaintiff, who was in an automobile accident, failed to object to an erroneous instruction, the appellate court could still review the trial court's decision to determine if it abused its discretion in granting a new trial when there was a failure to achieve substantial justice. Preservation of error is not a prerequisite to reviewing the trial court's decision to grant a new trial, *when the grant of a new trial is based upon the reason that the verdict did not achieve substantial justice or when the verdict is contrary to the evidence.*

*Erickson* states further that:

The fact plaintiff did not object to the instructions because of the matters above pointed out does not prevent our consideration of them in determining whether it has been shown the order for new trial was a clear abuse of discretion. (Citations omitted.)

Nor is it necessary reversible error was committed upon the trial. If such were the rule the trial court's power to correct *a failure of justice* would be meaningless. (Citations omitted.)

Four of the five decisions cited in defendant's reply brief affirm such an order as we have here. In the fifth, *Mazur v. Grantham,* 255 Iowa 1292, 1302, 125 N.W.2d 807, 813, we concluded the order for new trial was primarily based upon *claimed errors of law* we could not sustain, rather than a miscarriage of justice. Another precedent, ... *Jacobsen v. Gamber,* 249 Iowa 99, 86 N.W.2d 147, "more nearly resembles the cases in which the order for a new trial is based on an erroneous determination of a law question." Such cases present primarily the law question involved rather than the exercise of discretion. (Citations.) (Emphasis added.)

*Id.* at 790–91, 135 N.W.2d at 112–13.

It has also been long recognized that:

Where the court below, in granting or refusing a new trial, mistakes a legal proposition, it is as much the subject of revision as any other decision. In such cases, it is not a question of discretion, but one strictly legal in its character, and to be determined upon the law applicable to the case. (citations)

*Stewart v. Ewbank,* 3 Iowa 191, 192–93, 3 Clarke 191, 192–93 (1856); *see also Thompson v. Butler,* 223 Iowa 1085, 1091, 274 N.W. 110, 113 (1937); *Manders v. Dallam,* 215 Iowa 137, 244 N.W. 724 (1932).

In *Julian v. City of Cedar Rapids,* 271 N.W.2d 707, 709 (Iowa 1978), the court indicated that the standard of review for a trial court's decision to grant a new trial depends upon the reason why a new trial is granted:

The court did not base the new-trial grant on the failure of the verdict to effectuate justice or a similar discretionary ground, but on the basis that it had erred as a matter of law with respect to the burden of proof. In these circumstances the trial court's discretion is not involved, and its decision stands or falls on the legal correctness of its ruling on the legal question. The case comes within the rule that "the granting or refusal of a new trial on account of alleged errors of law occurring in the course of the trial is not a matter of discretion and is fully subject to review by the appellate court." 58 Am.Jur.2d New Trial § 212 at 433. As this court stated in *Hart v. Stence,* 219 Iowa 55, 59, 257 N.W. 434, 436, "We have also held that where the ruling upon a motion for a new trial presents a pure question of law, there is no room for the exercise of discretion on the part of the trial court, and that the abuse of discretion lodged in the trial court, under such circumstances, will be reviewed by this court, and the ruling of the trial court reversed if found to be erroneous." Here the court erred as to a matter of law in considering an alleged error in an instruction not raised by exception, contrary to the express proscription of rule 196, "No other grounds or objections shall be asserted thereafter or considered on appeal."

In this appeal, the bank in essence claims the court committed an error of law, in failing to instruct the jury adequately as to

what the Iowa law requires plaintiffs to prove by a preponderance of the evidence before plaintiffs can recover for the tort of intentional interference with prospective contractual relations.

■ Instructions given on this issue were in accord with the instructions requested by the bank. The bank objected to the submission to the jury of Petersons' claim on grounds regarding the sufficiency of the evidence. The bank's claims that the instructions misstated Iowa law were made for the first time in the motion for new trial. Objections first raised in a motion for judgment notwithstanding the verdict or for a new trial are too late to be considered on appeal because such objections must be made before instructions are read to the jury. *Nelson v. Steiner*, 262 N.W.2d 579, 582–83 (Iowa 1978). It is recognized that:

> [A]ll objections to instructions must specify the objectionable matter, on what grounds and none other will thereafter be considered. It is incumbent on the objecting party to point out wherein he contends the instruction is wrong so the trial court may have opportunity to correct it.

*Pose v. Roosevelt Hotel Co.*, 208 N.W.2d 19, 25 (Iowa 1973); *see also Wagaman v. Ryan*, 258 Iowa 1352, 1358, 142 N.W.2d 413, 417 (1966).

The bank did not make timely objection to the error claimed in these instructions. The objection to such instructions was first made in the bank's motion for new trial, and was not made prior to the argument to the jury. *See* Iowa R.Civ.P. 244(h). The instructions satisfied the requests specifically made by the bank, and the bank cannot now be heard to object to the instructions it requested. *State v. Overmann*, 220 N.W.2d 914, 919 (Iowa 1974). Due to this invited error, the error, if any, was waived.

Because the bank waived error in the instructions submitted to the jury, and since we are not considering whether the court abused its discretion in granting a new trial, but rather whether the court committed an error of law, the court's order of a new trial on this ground is reversed.

## II. Preservation of Error on Cross-Appeal Issues.

The bank raises numerous issues on cross-appeal and claim error was preserved on such issues during the motion for directed verdict, motion for new trial, and hearing on the motion for new trial.

■ A motion for judgment notwithstanding the verdict under Iowa R.Civ.P. 243 is limited to issues raised in a timely motion for directed verdict. *Stortenbecker v. Goos*, 310 N.W.2d 535, 537 (Iowa Ct.App. 1981). In reviewing a motion for directed verdict, the appellate court must consider the evidence in the light most favorable to the non-moving party, in this instance the Petersons. Iowa R.App.P. 14(f)(2); *see also Bannon v. Pfiffner*, 333 N.W.2d 464, 469 (Iowa 1983); *Rippel v. J.H.M. of Waterloo, Inc.*, 328 N.W.2d 499, 500 (Iowa 1983). The Petersons correctly state that error can only be preserved before the case is submitted to the jury so that any preservation of error claims founded on events after the verdict cannot be considered.

Our task is to determine which, if any, of the cross-appeal issues raised by the bank were preserved during the motion for directed verdict. General principles in Iowa involving preservation of error have been stated as:

> In determining the sufficiency of an objection to preserve error, "the test is whether the exception taken alerted the trial court to the error which is urged on appeal." *Dutcher v. Lewis*, 221 N.W.2d 755, 759 (Iowa 1974). The purpose is "to afford the trial judge an opportunity to catch exactly what is in counsel's mind and thereby determine whether the objection possesses merit to an extent the instruction should be recast." *State v. Baskin*, 220 N.W.2d 882, 886 (Iowa 1974).

*Goetzman v. Wichern*, 327 N.W.2d 742, 745 (Iowa 1983). Another reason for preservation of error is that:

[P]reservation of error also contemplates the construction of an appropriate and sufficiently detailed record upon which the reviewing court can base its decision. In this sense, offers of proof or the utilization of procedural devices to secure a record of otherwise unreported matters become necessary prerequisites to appellate review.

Allbee & Kincaid, *Error Preservation in Civil Litigation: A Primer for the Iowa Practitioner*, 35 Drake L.Rev. 1, 3 (1985–86). Applying these principles to the facts of this case, we find the record indicates error was preserved by the bank's trial counsel on the following matters: that Petersons had the burden of proof to show an agreement existed and to establish that paying an antecedent debt was consideration was provided; justification as a matter of law existed for complying with the agreement; damages as to lost profits because no profits existed and given the business's past profit history (this is erroneous because Petersons' loans for 1982 were approximately $400,000 and debt in 1982 was $180,000, and in 1983 his debt was estimated to be $81,000 and in 1984 his debt was estimated to be $12,000; this shows profits of almost $170,000 over the course of two years) and no punitive damages could be awarded because no evidence existed as to the bank's net worth; and the Petersons had debts owed to the bank on the counterclaim.

We also find error was preserved on the claim based on the theory that intentional interference of *existing* contractual relations should not have been submitted to the jury because Petersons had not paid their rent which meant they had no right to farm the Staskal Farm.

■ The bank attempts to argue that because error was preserved on damages generally that we can entertain their new theory which basically segregates Petersons' farming operation into three different entities. While the bank's theory as to damages may have merit, we cannot find that this theory, especially regarding the Home Farm and Caraway Farm, was adequately raised with the requisite degree of specificity in timely fashion so that the trial court could correct any alleged error. Therefore, we cannot entertain this theory on appeal because error was not preserved. This case was tried on three theories, namely: intentional interference with existing contractual relations; intentional interference with prospective contractual relations; and breach of a contract to lend money. The parties and the trial court submitted the case to the jury on the premise that actual damages, if any, which resulted from any of the three theories of recovery would be identical. The alleged injury was to Petersons' entire farming operations in 1983 and 1984. The record contains no mention of the Home Farm, Caraway Farm, and Staskal Farm as separate entities.

### III. Reviewable Cross-Appeal Issues.

We now address the bank's cross-appeal issues in which the alleged errors were adequately preserved.

■ **A. Interference with Existing Contract.** The bank preserved error on its claim that the theory of intentional interference with an existing contract should not have been submitted to the jury because the contract was breached by Petersons before the alleged interferring took place so that no contract was in existence. The Petersons assume in their reply brief that the existing contract theory was properly submitted but do not support this assertion with any discussion.

We also note that the record contains Petersons' proposed Instruction II.4, which provided:

The term "contract" as used in these instructions means an existing agreement between two or more persons or parties to do something or not to do something for the breach of which the law provides a remedy. There is no dispute as to the existence of a contract between plaintiff Keel Peterson and Staskal Farms, Inc.

The bank's proposed jury instruction nos. 28 and 29 provided:

One who breaches a contract may not maintain an action for interference with or inducement to breach the contract against another when the asserted interference or inducement occurred during a continuance of the plaintiff's own breach. Thus, if you the jury should find that plaintiff failed to pay the rent to Staskal Farms, Inc. on or before November 1, 1983, then that would be a breach of plaintiff's agreement with Staskal Farms, Inc. so that defendant cannot be held liable for an alleged interference with or inducement to breach the lease agreement between plaintiff and Staskal Farms, Inc.

\*     \*     \*

In a claim for interference with an existing contract relation you must find that by reason of the defendant's act, a contract which otherwise would have been performed was abandoned. Thus, if you find that plaintiff would not have been able to perform the agreement with Staskal Farms, Inc., by paying the rent, without defendant's failure to lend the money, then you must find that plaintiff cannot prevail on the theory of interference with an existing contract.

The instruction as submitted, no. 17, however, provided:

The term "contract" as used in these instructions means an existing agreement between two or more persons or parties to do something or not to do something for the breach of which the law provides a remedy. A farm lease contract existed between plaintiff, Keel Peterson, and Staskal Farms, Inc., until terminated February 1, 1983.

Petersons' position, as gleaned from its trial brief, is that because Staskal Farms did not serve a notice of termination of farm tenancy prior to September 1, 1982, plaintiffs had the right to farm the ground in the 1983 crop year. Presumably, Petersons felt this establishes that a contract existed after the November 1 breach.

The bank moved for directed verdict on its theory that an existing contract was not present so that it could not be interfered with intentionally. The trial court overruled this motion. The bank further objected to Instructions 15–20 because those instructions dealt with intentional interference with an existing contract.

This case poses the question of whether a breach of contract caused by nonpayment of rent by the tenant which is not induced by the actor (bank) precludes recovery based on intentional interference with existing contractual relations where the alleged tortious interference which occurred after the breach did arguably cause the landlord to terminate the lease. *Restatement (Second) of Torts* § 766 at 7 (1977) provides:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Comment f of this section further indicates:

The particular agreement must be in force and effect at the time of the *breach that the actor has caused;* and if for any reason it is entirely void, there is no liability for causing its breach. Furthermore, it must be applicable to the particular performance that the third person has been induced or caused not to discharge. It is not, however, necessary that the contract be legally enforceable against the third person. A promise may be a valid and subsisting contract even though it is voidable. (See Restatement, Second, Contracts § 13). The third person may have a defense against action on the contract that would permit him to avoid it and escape liability on it if he sees fit to do so. Until he does, the contract is a valid and subsisting relation, with which the actor is not permit-

ted to interfere improperly. Thus, by reason of the statute of frauds, formal defects, lack of mutuality, infancy, unconscionable provisions, *conditions precedent to the obligation* or even uncertainty of particular terms, *the third person may be in a position to avoid liability for any breach. The defendant actor is not, however, for that reason free to interfere with performance of the contract before it is avoided.* (emphasis added)

We cannot find any case on point with this scenario. *But see Jewel Companies, Inc. v. Pay Less Drug Stores Northwest, Inc.,* 510 F.Supp. 1006, 1011 (N.D.Calif.1981) (because first requirement for a claim of intentional interference with contractual relations is the existence of a valid contract which is in force and effect at the time of the breach that the party caused, a proposed corporate merger which had to be approved by shareholder was held to be arguably incomplete and not susceptible to interference thereon); *Colorado Accounting Machines, Inc. v. Mergenthaler,* 44 Colo.App. 155, 156, 609 P.2d 1125, 1127 (1980) (contract between former employee and employer which was void because it contained restrictive covenant could not have been interfered with because no contract existed); *Charolais Breeding Ranches, Ltd. v. FPC Securities Corp.,* 90 Wis.2d 97, 104–07, 279 N.W.2d 493, 497–98 (Wis.Ct.App.1979) (a contract which is terminable at will by third party investors can give rise to tort of intentional interference with existing contractual relations where actor-sales agent induces investors to breach agreement with business they had invested in).

This fact pattern poses a difficult question. On the one hand, Petersons breached the lease by not paying rent when it was due in November, which indicates the bank did not induce that breach so as to be liable for interfering with an existing contract, while, on the other hand, the bank's actions on December 6 could have caused the lawsuit to be filed on December 14 or the lease to be terminated in February, which indicates that even though a condition prece-

dent (nonpayment of rent) was not performed the bank was not free to interfere until the contract was avoided.

Iowa law provides "absent a contract a valid claim for tortious interference with a contract cannot exist." *Bump v. Stewart, Wimer & Bump, P.C.,* 336 N.W.2d 731, 737 (Iowa 1983) (citing *Restatement (Second) of Torts,* § 766 comment a, at 8 (1977)). Even though notice of termination was not sent until February 1, 1983, which meant Petersons could farm the Staskal land in 1983, *see* Iowa Code § 562.6 (1983), Petersons' failure to perform under the lease by failing to pay rent on November 1, 1982, resulted in the contract being breached. *See Riggs v. Meka,* 236 Iowa 118, 123, 17 N.W.2d 101, 104 (1945) ("It is our conclusion that the tenant-appellant in failing to pay the rent at the times required in the lease and in the promissory notes, thereby defaulted in the performance of the existing rental agreement, as provided in that portion of said Code, section 10161, which we have italicized herein, and that because of said default, the service of the notice to terminate the lease on the March 1st following, as specified by the statute, was not required of the landlord-appellee."). Nonetheless, Petersons' breach by not paying rent on November 1 did not justify the bank's alleged interference which occurred on December 6, 1983 because the contract existed until it was terminated in February. Thus, this theory was properly submitted to the jury.

**B. Breach of Contract.** The next issue we address is the breach of contract theory. This theory was submitted to the jury under instructions nos. 31–36. Petersons claimed at trial the bank agreed to loan the Petersons funds to pay the Staskal rent after the CCC proceeds were deposited with the bank. The bank maintained as a factual matter that it did not agree to loan Petersons funds to pay the Staskal rent. The bank also asserted as a matter of law the breach of contract theory should not have been submitted to the jury because Keel Peterson only agreed to pay an exist-

ing debt when he deposited the CCC proceeds which could not constitute consideration to support another agreement to lend money.

The bank properly preserved error on its contention during the motion for directed verdict and when objections to proposed instructions were entertained. The trial court instructed the jury as follows:

No. 31. Plaintiffs claim that the defendant Bank breached a contract with them to use part of the money received from the commodity credit corporation to pay their landlord.

\*       \*       \*

No. 35. "Consideration" is defined as the inducement to a contract. Such inducement can be some right, interest, profit, or benefit accruing to one party or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another. A promise by one party to do or to forbear from doing some act or thing in exchange for a promise by another party to do or to forbear from doing some act or thing can be consideration.

Here, plaintiffs claim as consideration that the defendant promised to loan them money to pay the Staskal rent if they delivered to it all proceeds from the CCC loan.

If you find there is no consideration as defined herein, then your verdict should be for defendant.

The bank directs us to authority which indicates that a promise to pay that which is already owed is not consideration. *Lovlie v. Plumb*, 250 N.W.2d 56, 61–62 (Iowa 1977) (citing *Anderson v. Lundt*, 200 Iowa 1265, 206 N.W. 657 (1925)). While we have no doubt this accurately reflects contract law on this topic, the facts of this case are such that Peterson's payment of an existing debt did constitute consideration. Petersons, no doubt, were under an obligation to repay debts represented by several promissory notes; however, none of these notes were past due. In fact, most of the outstanding debt was not due until four months later. Petersons were under no

obligation to apply these particular CCC proceeds to the debts owed the bank on December 6, 1982. Petersons' decision to repay the loan in this fashion could have been valid consideration for an offer by the bank to loan Petersons funds to pay the Staskal rent. Stated otherwise, if the bank would not loan Petersons money to pay the Staskal rent, there is no reason to believe the CCC proceeds would have been used by Petersons to pay the bank loan. The bank raises other alleged errors involving the breach of contract claim, but we find no merit in any of these positions. We find the breach of an oral contract theory was properly submitted.

**C. Emotional Distress.** The bank contends insufficient evidence of intentional infliction of emotional distress was established. The bank misconstrues the verdict. The Petersons did not sue the bank on a theory of intentional infliction of emotional distress, but rather under tort theories under which damages could be awarded for emotional distress. *See* Restatement (Second) of Torts § 774A(b)(1); *see also Holmquist v. Volkswagen of America, Inc.*, 261 N.W.2d 516, 526 (Iowa Ct.App.1977) (in tort action damages included amount for mental anguish).

■ **D. Defense of Justification.** The bank claims it established the affirmative defense of justification and should have been granted judgment notwithstanding the verdict. We disagree.

The instruction regarding justification which correctly stated the law in this area provided:

1. The Defendant at the time of the acts had a financial interest in the business of Plaintiff;

2. That Defendant acted with the intent to protect its interest from being prejudiced by the contract or relation;

3. That Defendant did not employ improper means.

We find, without addressing the first two elements of the justification defense, that the jury reasonably could have determined

the bank did not employ proper means. Even though the verdict was general, the jury could have found for the Petersons on a tort theory because punitive damages were awarded and improper means was a necessary finding under either tort theory. The evidence was such that the jury could have determined that the justification defense was not established.

E. **Damages.** The bank also strenuously objected to compensatory damages based on lost profits. A key determination on this issue is whether Petersons undertook reasonable efforts to seek alternative financing. Although Petersons only went to one other bank to seek financing after defendant bank denied their request, we find Petersons went to the only two banks they had prior financial experience with and given their considerable debt load, it was reasonable to assume no lending institution with whom they had no previous dealings would loan them necessary funds. Because Petersons made satisfactory attempts to secure alternative financing, their damages were not limited merely to the difference in interest rates. We also find the "new business" rule was not applicable so that the damages awarded for lost profits was appropriate. We further find the verdict was not so excessive to show prejudice and that substantial justice was rendered.

F. **Counterclaim.** The bank maintains it is entitled to entry of judgment notwithstanding the verdict on its counterclaim for approximately $206,716. The bank apparently premised this claim on the trial court's decision to grant a new trial and sought not to have to relitigate this issue. Given our disposition, we do not need to address this issue.

### IV. Conclusion.

We find the trial court should not have granted the bank a new trial based on the erroneous instruction. We also conclude that none of the cross-appeal issues raised by the bank merit reversal. Thus, we reinstate the jury verdict.

JURY VERDICT REINSTATED.