In the Matter of the ADOPTION OF
John Michael BAADE, a
Minor Child.

No. 16783.

Supreme Court of South Dakota.

Argued April 24, 1990.

Decided Oct. 31, 1990.

Daniel L. Jongeling of Dakota Plains Legal Services, Sisseton, for appellant and natural father, Justin Kongi.

Terry L. Pechota of Finch, Viken, Viken and Pechota, Rapid City, for appellees and adoptive parents, Nancy and Dan Ponton.

SABERS, Justice.

Justin Kongi appeals an order terminating his parental rights and declaring the child adopted.

## Facts

Justin is the natural father of John Baade, who was born in Pierre, South Dakota on October 18, 1986. Connie Baade is the natural mother. Both were living in Pierre, South Dakota at the time of conception and birth. At the time of John's birth, Justin was fifteen and Connie was sixteen years old. Although Justin was aware of the pregnancy, he had no contact with Connie after the conception.

Connie decided during her pregnancy to have her sister and brother-in-law, Nancy and Daniel Ponton, adopt the child. As a result, the Pontons have had physical custody of John since his birth. Justin and his mother, Evelyn Black Smith, knew of the adoption plans because they were presented with adoption papers before John's birth. The adoption consent papers were never signed. Evelyn saw the Pontons in Pierre about a week after John was born, and she knew they were taking John with them to Rapid City. Shortly thereafter, she and Justin moved to Waubay, South Dakota. Justin has never seen John.

In April of 1988, the Pontons filed a petition in circuit court to adopt John, and Connie filed her consent to the adoption. The petition alleged that Justin abandoned John, making his consent unnecessary. The court ordered that an investigation report be prepared in accordance with SDCL 25–6–10.[1]

Justin was served with notice of the adoption proceeding in May of 1988. Shortly thereafter, he petitioned the circuit court to transfer the adoption proceeding to the Sisseton–Wahpeton tribal court. In response, Connie filed an objection to the transfer of the proceeding. The petition to transfer was later denied and not appealed.

Justin started a paternity action in tribal court in November of 1988, and, after being adjudged the father of John, he enrolled John as a member of the Sisseton–Wahpeton Sioux Tribe. The tribe received notice of the adoption proceeding in January of 1989.

A hearing to determine whether Justin abandoned John was held on April 10, 1989. The tribe was represented at the hearing by Judge Lorraine Rousseau of the Sisseton–Wahpeton tribal court. At the hearing, the investigation report, prepared in accordance with SDCL 25–6–10, was admitted into evidence and the author of the report testified. The court found that Justin abandoned John and his consent to the adoption was not necessary. The court's specific findings include:

7. There has been no attempted contact with the child on the part of [Justin] whatsoever since the birth of the child.

8. [Justin] made no efforts to exercise responsibility or interest in [John] until the filing of the petition for adoption. Even after the filing, the only thing that [Justin] did was to file an action in Sisseton–Wahpeton Tribal Court claiming paternity of [John].

. . . . .

10. Both [Evelyn and Justin] have had the unrestricted opportunity since the birth of [John] to be involved in [John's] life, aware of [his] whereabouts, to request visitation and contact with [John], but neither have attempted to do so except as set forth above.

11. No one has ever concealed from [Justin and Evelyn] the location of [John] and his custodian, or the fact that [he] was born and was in existence.

. . . . .

14. Neither [Justin or Evelyn] have ever shown any love, care, or affection for said child.

15. Prior to and after the birth of [John], efforts were made by the natural mother's family to contact [Justin], but there was difficulty doing so; [Jus-

1. **SDCL 25–6–10. Time of hearing on petition fixed—Investigation ordered by court.** Whenever a person, or a husband and wife jointly, petition the circuit court for leave to adopt a minor child, the judge of the circuit court shall fix a time for hearing not less than ten days from the filing of such petition and may, in the case of a stepparent adopting a stepchild, and shall in all other cases, direct a court services officer or other officer of the court or an agent of the department of social services or some other discreet and competent person to make a careful and thorough investigation of the matter and report his findings in writing to the court.

tin] never recognized paternity of [John] until after the filing of the petition for adoption.

16. [Justin] has no intention of himself providing for the care of [John] in the immediate future.

. . . . .

18. [John] has bonded with the ... Ponton ... family and has known the Pontons as his parents since birth.

19. That beyond a reasonable doubt the physical and emotional health of John and his best interest would be jeopardized and deleteriously affected if the bonding that exists with the Pontons is broken or interrupted, and any such disruption could be permanent.

20. [Justin] could not replace the bonding which has been established with the Pontons. At the very best, under the scenario given by [Justin], he would see [John] on a monthly basis for the next four or five years without any parental involvement with [him]. [John] could not become bonded with [Justin] until he had finished school which would deprive [John] of a major benefit in his health, well being, and development.

. . . . .

25. Any custody of [John] by [Justin] is likely to result in serious emotional or physical damage to [John] and this has been established beyond a reasonable doubt.

A hearing to determine whether the adoption was in the best interest of John was held on June 8, 1989. Neither the tribe nor Justin appeared. The court approved the adoption and entered its order declaring the child adopted. Justin appeals the order. We affirm.

1. *Consideration of SDCL 25-6-10 investigation report during abandonment hearing.*

■ Justin claims the trial court improperly admitted the investigation report during the abandonment hearing, contrary to *In re Adoption of Zimmer,* 299 N.W.2d 574 (S.D.1980). However, Justin did not object at the time the report was admitted nor did he object to the testimony of its

author. Objection to the report was not raised until Justin filed his Objections to Prospective Adoptive Parents' Proposed Findings of Fact and Conclusions of Law. Such objection is too late to preserve the issue for appeal because the trial court could easily have corrected the alleged error by refusing admission. As we stated in *In re A.I.,* 289 N.W.2d 247, 249 (S.D.1980): "Generally, error must be brought to the attention of the trial court as soon as it is apparent and failure to object at a time when the court can take corrective action precludes appellate review." *Cf. Franz v. Brennan,* 146 Wis.2d 541, 431 N.W.2d 711, 715 (Wis.App.1988) ("[A]n objection to the court's failure to give an instruction cannot be made for the first time in a post-trial motion."), *aff'd,* 150 Wis.2d 1, 440 N.W.2d 562 (1989); *Peterson v. First Nat'l Bank of Iowa,* 392 N.W.2d 158, 163 (Iowa App. 1986) ("Objections first raised in a motion for judgment notwithstanding a verdict or for a new trial are too late to be considered on appeal because such objections must be made before instructions are read to the jury.") *Aff'd,* 423 N.W.2d 889 (Iowa 1988).

■ Justin claims that he objected at his first opportunity because his counsel did not have a copy of the report until after it was offered and received. However, Justin's counsel knew that it was the report prepared in accordance with SDCL 25-6-10. Since the objection is not to the content of the report, but to the admission of the report, it was not necessary to review the content before deciding whether to object. Therefore, Justin is precluded from raising this issue on appeal.

2. *Trial court's findings of fact were not clearly erroneous.*

■ Justin challenges ten of the trial court's findings as clearly erroneous. We will not set aside the trial court's findings of fact unless they are clearly erroneous and we are left with a firm conviction that a mistake has been made. *In re J.J. & S.J.,* 454 N.W.2d 317, 321 (S.D.1990).

Justin claims that Findings 7, 8, 10, 11 and 14 overlook numerous relevant material factors. He dislikes the inferences that

can be drawn from these findings and believes they do not present a complete picture of the facts. However, he fails to point to any evidence that would indicate any of these findings are incorrect. For example, he fails to point to any evidence that he made an attempt to contact his son or that he was ever prevented from doing so. While the facts do not paint the picture Justin desires, he offers no basis for deeming them clearly erroneous.

Justin claims that Finding No. 15 overlooks the underlying purpose of the attempts by Connie's family to contact him. Again, he does not point to any evidence that is contrary to this finding or shows that he did acknowledge paternity before the adoption proceedings began. Nor does he dispute that efforts to contact him were made. Therefore, we cannot set aside the finding.

Justin's challenge to Finding No. 16 likewise fails to show how the finding is erroneous. Justin claims the finding ignores the arrangements he has made with his mother for her to care for John while he is attending college. Yet those arrangements do not refute the fact that Justin himself will not be providing John's care.

Finally, Justin claims that Findings 19, 20 and 25 misstate the testimony of the author of the investigation report. The author of the report testified that John would be emotionally damaged if he were taken from the Pontons. Since custody by Justin would necessarily require removal of John from the Pontons, serious damage to John would result from such custody. Further, since Justin would be able to see John on a very limited basis while he was at school, he would not be able to replace any lost bonding with the Pontons. Therefore, we cannot say these findings are clearly erroneous.

### 3. *Indian Child Welfare Act.*

■ Justin claims the Indian Child Welfare Act (ICWA) prohibits termination of his parental rights without evidence beyond a reasonable doubt that continued custody of John by Justin is likely to result in serious emotional or physical damage to John. 25 U.S.C. § 1912(f) (1988). The Pontons contend ICWA is not applicable to this case due to our opinion in *Claymore v. Serr*, 405 N.W.2d 650 (S.D.1987). That opinion followed the reasoning of the Kansas Supreme Court in *In re Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168 (1982), and concluded that ICWA was concerned with the removal of Indian children from existing Indian family units. As a result, we concluded in *Claymore, supra* at 653, that: "[T]he Act is not applicable in a case where an illegitimate child, who had never been a member of an Indian home or culture, is the subject of a child custody proceeding."

■ In light of the United States Supreme Court decision in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), and our decision in *J.J., supra*, we believe *Claymore* is inapplicable to this case. *See* Tellinghuisen, *The Indian Child Welfare Act of 1978: A Practical Guide With [Limited] Commentary*, 34 S.D.L.Rev. 660, 671 (1989) ("After the decision in *Holyfield*, it appears that the Kansas court in *Baby Boy L.* may have given inappropriate weight to the wishes of the family."). In *Holyfield*, the Supreme Court explained the broad scope of ICWA: "The numerous prerogatives accorded the tribe through the ICWA's substantive provision ... must, accordingly, be seen as a means of protecting not only the interests of individual Indian children and families, *but also of the tribes themselves.*" *Id.* 109 S.Ct. at 1609 (emphasis added). Consequently, it is incorrect, when assessing ICWA's applicability to a particular case, to focus only upon the interests of an existing family. *See* Note, *The Indian Child Welfare Act of 1978: Does it Apply to the Adoption of an Illegitimate Indian Child?*, 38 Cath.U.L.Rev. 511, 534 (1989) ("In light of the legislative history of the ICWA, the existing Indian family theory is thus contrary to the intent of Congress." (footnotes omitted)). Such a practice fails to recognize the legitimate concerns of the tribe that are protected under the Act. *See* Tellinghuisen, *supra* at 666 ("*Holyfield* also carries the clear message that [ICWA] would be read liberally,

perhaps creatively, to protect the rights of the tribe even against the clearly expressed wishes of the parents...."). ICWA's application to a case is contingent only upon whether an "Indian child" is the subject of a "child custody proceeding" as those terms are defined by the Act. *See In re Adoption of a Child of Indian Heritage,* 111 N.J. 155, 543 A.2d 925 (1988); *see also A.B.M. v. M.H.,* 651 P.2d 1170, 1172 (Alaska 1982) ("The protections of the Act apply to child custody proceedings involving Indian children."), *cert denied,* 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); Note, *supra,* 38 Cath.U.L.Rev. at 540 ("Congress clearly intends that the only prerequisite to the operation of the ICWA be the involvement of an Indian Child in a child custody proceeding."). This was the approach this court followed in its recent decision in *J.J.,* wherein we stated: "It being undisputed that the children are of Indian blood, the provisions of [ICWA] are implicated." *Id.* at 318. Therefore, with John falling within the Act's definition of "Indian child" and the abandonment and adoption hearings falling within the Act's definition of "child custody proceedings," the Act is applicable to this case.

 Since the circuit court order terminated Justin's parental rights and declared John adopted, the evidentiary requirement of 25 U.S.C. § 1912(f) must be followed.[2] Justin claims the evidentiary requirements were not satisfied because the expert testimony at the hearing only addressed the harm that would result to John if he were separated from the Pontons. Justin contends compliance with ICWA requires the presentation of additional evidence showing that he and his mother could not provide a good home for John. We disagree. The evidence was sufficient to support the trial court's finding that John would suffer serious emotional damage if Justin were to retain continued legal custody. Although Justin has never had physical custody of John, the custody referred to in § 1912(f) is legal custody rather than physical custody. *See In re Adoption of a Child of Indian Heritage, supra; cf. In re Welfare of W.R. and A.R.,* 379 N.W.2d 544 (Minn.App.1985). Thus, ICWA requires a showing that continued legal custody by Justin would result in serious emotional damage to John. The author of the investigation report testified that John would suffer serious emotional damage if he were removed from the care of the Pontons. If Justin retained legal custody of John, the Pontons would be unable to adopt John, and would have no basis for maintaining physical custody. As a result, Justin's continued legal custody of John would result in the child having to leave the Pontons, which would produce serious emotional damage. Therefore, the requirements of ICWA were met.[3]

### 4. *Abandonment.*

 Justin takes exception to the trial court's first six conclusions of law.[4] Justin claims that Conclusions 1 and 2 overlook his young age and the lack of warmth and encouragement he received from the Baade

---

2. **Parental rights termination orders; evidence; determination of damage to child**
 No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

3. We note that the adoption of John by the Pontons complies with the ICWA's directive that adoption by a member of the child's extended family shall be given preference.

4. Conclusions of Law numbers 1 through 6:
 1. Justin Kongi has failed to provide any monetary support, his presence, love, care, and affection for his natural child for a period of one year.
 2. [Evelyn] has failed to provide any monetary support, her presence, love, care, and affection for [John] for a period of one year.
 3. That [John] has been abandoned by his natural father under the provisions of SDCL 25–6–4(2).
 4. That the consent of the father, Justin Kongi, is not required as a condition of the adoption of [John] by Daniel and Nancy Ponton.
 5. The petition for transfer to the Sisseton–Wahpeton tribal court should be and hereby is denied in all respects.
 6. Any custody of [John] by [Justin] is likely to result in serious emotional or physical damage and this finding by the court is beyond a reasonable doubt.

and Ponton families, who planned prior to John's birth to terminate Justin's parental rights. As a result, Justin claims the evidence does not establish the necessary intent on his part to abandon John. Finally, Justin claims the evidence only established that damage would result to John if he were removed from the Pontons, but there was no evidence that custody of John by Justin would result in damage.

■ To establish abandonment, there must be a showing by clear and convincing evidence that the parent intended to abandon and relinquish parental obligations to the minor child. *Claymore, supra.* An intention to abandon may be inferred from conduct, and factors to be considered include a parent's presence, love, care, affection, and monetary support. *Id.* at 655. "Whether a parent has abandoned a child under SDCL 25–6–4 is a question of fact to be decided by the trial court." *Id.* Although labeled conclusions of law, Conclusions 1 through 4 and 6 are findings of fact because they address whether John has been abandoned. Consequently, we may overturn the findings only if they are clearly erroneous.

■ We agree with Justin that his age and the behavior of the Baade and Ponton families are factors for the trial court to consider when determining whether John has been abandoned by Justin. Nevertheless, Justin offers no evidence that the trial court did not consider these factors. In fact, these factors were testified to at the abandonment hearing, and one of the trial court's findings recognized that Justin was a minor at the time of John's birth. Furthermore, while these factors may affect Justin's success in attempting to be involved in his son's life, they do not excuse the lack of any attempt to become so involved for over one year. Such a failure to attempt *any* contact allows a reasonable inference that abandonment was intended. In addition, there was testimony that Justin denied he was the father while Connie was pregnant with John, and he would not acknowledge he was the father when contacted by Connie's sister during the pregnancy. This evidence strengthens the inference that Justin intended to abandon the child. With regard to the lack of evidence pertaining to Justin's ability as a parent, such evidence is not necessary to demonstrate that damage to John would result from custody by Justin, as discussed above. Justin simply failed to offer evidence showing any love, care or affection for John. As a result, we cannot say the trial court was clearly erroneous in determining that Justin abandoned John.

MILLER, C.J., and, WUEST and MORGAN, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

This case is a sad commentary on the justice system in South Dakota. Deeming the majority opinion to be totally without judgment as to the reality of the social and economic circumstances of a 14 year old Indian boy who impregnated a 16 year old white girl and then has a son taken away from him on the theory of "abandonment," who he was denied the right to see, I respectfully dissent. He should not lose his son—forever. And under the majority opinion, forever and a day, he shall not see his son nor enjoy his company.

SDCL 25–6–4 permits a court to terminate parental rights if it is determined that the parent has abandoned his or her child. The South Dakota Supreme Court has determined the standard for determining if abandonment has occurred. *Mastrovich v. Mavric,* 66 S.D. 577, 287 N.W. 97, 97–98 (1939). In *Mastrovich,* we stated:

> To constitute abandonment under our code it must appear by clear and convincing evidence that there has been by the parents *a giving-up or total desertion of the minor child.* In other words, there must be shown an *absolute relinquishment of the custody and control of the minor* and thus the laying aside by the parents of all care for it. (Emphasis supplied mine).

*See also Adoption of Ernst,* 318 N.W.2d 353 (S.D.1982); *Matter of Adoption of Everett,* 286 N.W.2d 810 (S.D.1979) *supra; In*

re Adoption of Christofferson, 89 S.D. 287, 232 N.W.2d 832 (1975) *supra*.

In *Christofferson, supra,* we held that in order to support a finding of abandonment the evidence must establish an intent on the part of the parent to abandon and to relinquish parental obligations with respect to a child. We also held that this intent to abandon may be inferred from conduct. We further established that the factors to be considered in determining abandonment include a parent's presence, love, care and affection, and monetary support. In *Everett, supra,* we held that, in determining if intent to abandon is established by the evidence, the trial court may consider the subjective statements of the parents in addition to objective factors.

In the present case, judging it on its own unique facts, subjective statements and objective factors indicate that Justin did not intend to abandon his son John. Intent to abandon is an essential element of abandonment and the conduct of the parent or parents involved must evince a settled purpose to relinquish all rights in the child. 43 C.J.S. Infants § 38. Some courts have held that mere inaction or lack of interest in a child for an extended period of time are insufficient. *In re Adoption of Farabelli,* 460 Pa. 423, 333 A.2d 846 (1975). In *Farabelli,* the Supreme Court of Pennsylvania wrote:

> We have stated, even inaction or lack of interest in a child for a period in excess of six months will not conclusively establish the required settled purpose of relinquishment. This section has been interpreted as requiring a deliberate decision on the part of the parent to terminate the parental relationship and that parent must persist in that determination throughout the six-month period.

Therefore, I cannot conclude that there is clear and convincing evidence in the record that Justin met the "abandonment test" established in *Mastrovich.*

While it is true that Justin's contacts with John were non-existent, the majority opinion completely overlooks the reasons why. First, Justin was only 14 years of age when John was born. Second, John was taken from Pierre to Rapid City within one week of his birth. Obviously, this denied this 14 year old boy's opportunity to see his son. Third, Justin's mother moved him halfway across the state, making it virtually impossible to establish or maintain any relationship with his son. Justin was then 400 miles from his son with no transportation, no job, no money, and totally dependent upon his own mother for support. Justin has his own natural guardian, his mother. In sum, it is my opinion that Justin is being held to a legal standard applicable to adults during a time when he was not an adult. Under SDCL 15-6-17, he was an "infant" who must be represented in law by a natural guardian or guardian ad litem. The youth and inexperience of a child of this age should be considered in assessing conduct. So it logically follows that reasonableness of conduct depends, in part, on the person's characteristics, examples being his/her age, employability, health, economic infirmity and character. We need to recognize Justin's immaturity of judgment and lack of ability to appreciate his very own actions in comparison to the judgment, discretion and experience of an adult. He was, after all, a boy who sired a boy. He cannot be said to be a man—and judged like a man, because he indulged in sexual intercourse one night at a teenage party, which the evidence shows.

Furthermore, Justin has continually expressed the subjective intent to establish his parental rights and gain custody of his son. He has appealed the termination of his parental rights in this case and he has expressed to others his desire to raise his son.

The record does not sustain a finding that Justin's conduct demonstrated a conscious disregard of his parental obligations. Under SDCL 25-6-4, this is a question of fact to be decided by the trial court as to whether a parent has abandoned a child. If the finding is clearly erroneous, the finding should be overturned on appeal. *Matter of Adoption of Sichmeller,* 378 N.W.2d 872 (S.D.1985). In my opinion, the finding of abandonment here is clearly erroneous. Furthermore, the evidence of abandonment

must be by "clear and convincing evidence standard"; it does not exist under this factual scenario. *Claymore v. Serr*, 405 N.W.2d 650 (S.D.1987).

Not once, since the birth of the child, has anyone ever permitted this young Indian boy to see his son. To me, that is inhumane. Only hatred, hostility, and prejudice can birth such conduct. The natural white mother made a decision, with the aid of her parents, to have her own white family adopt this child. The baby was removed from Pierre to Rapid City within one week of its birth. Within a very short time thereafter, Justin was moved to the other end of the state. Picture a 14 year old boy, living under his mother's rule, with no car, no job, no money, and totally unemancipated under the law in South Dakota, (*see* SDCL 25–5–18) providing food, shelter, and clothing for his infant son. Justin did try to make contact through his mother, trying to contact the Ponton family. From the time that the young, white girl learned of her pregnancy, she decided unilaterally that her sister, Nancy Ponton, would adopt the baby. The young mother even failed to disclose to Justin that she was pregnant by him. All adoption proceedings and plans were "go," not only during the pregnancy, but within one week after the birth of the child, for an adoption consent was presented to Justin's mother. Later, the white community presented Justin with adoption proceedings and he emphatically said "No!" Justin tried to take his case into Tribal Court. Denied. Justin did succeed in having his son enrolled in the Sisseton–Wahpeton Sioux Tribe. This reflects his interest in his son and negates the conclusion of "Justin abandoned his son."

This decision is likened unto a wind bringing the cold. It is a harsh north wind. It causes the hills of hope to be further away and the streams of fairness to sing low. Does this decision keep our nobler purpose——certain?