474 N.W.2d 96 (1991)
In the Matter of the Dependency and Neglect of N.S., and Concerning J.S., His Mother.
No. 17307.
Supreme Court of South Dakota.
Submitted on the Briefs April 22, 1991.
Decided August 14, 1991.
*97 Jane Loveland Doyle, Rapid City, for appellant J.S.
Joan P. Baker, Asst. Atty. Gen. (Mark W. Barnett, Atty. Gen., on the brief), Pierre, for appellee State of S.D.
HENDERSON, Justice.

PROCEDURAL HISTORY/ISSUES
J.S. appeals from an order which terminated her parental rights as to her son, N.S. She raises four issues on appeal:
(1) Was the trial court clearly erroneous in finding that there was clear and convincing evidence to support the finding of dependency and neglect?
(2) Did the trial court err in terminating the parental rights of an Indian child by clear and convincing evidence?
(3) Were the trial court's final dispositional findings of fact and conclusions of law clearly erroneous?
(4) Was it error to submit proposed findings of fact and conclusions of law later than ten days as pursuant to SDCL 15-6-52?
We reverse on issue 2. Due to our decision, we decline to address the remaining issues.

FACTS
N.S. was born on May 10, 1988. J.S., a Caucasian, is the mother of N.S. Prior to the birth of N.S., J.S. experienced psychiatric problems and was hospitalized on at least two occasions. About nine months after the birth of N.S., J.S. was again admitted to a psychiatric unit as the result of a referral from the Addiction Recovery Center. At discharge, J.S. was diagnosed *98 as having a borderline personality disorder and a problem with alcohol.
The Department of Social Services first had contact concerning N.S. on June 5, 1989. J.S. told a counselor that she was concerned that her brother would sexually abuse her son. Later, J.S. denied these concerns.
On June 21, 1989, J.S. requested adoption services for N.S. However, the next day J.S. changed her mind. J.S. believed that her mother (N.S.'s grandmother) wanted permanent custody of N.S.
On July 6, 1989, J.S. once again wanted to relinquish N.S. for adoption. J.S. apparently was having difficulties with her own mother and did not feel that they could properly care for N.S. On July 10, 1989, J.S. was planning to give full custody of N.S. to her mother.
On August 22, 1989, J.S. again wanted to place N.S. for adoption. N.S. was then placed in foster care and a petition was filed. However, on August 25, 1989, J.S. again changed her mind and wanted N.S. back. J.S. agreed to work with the Department of Social Services for the return of N.S. She signed a case service plan that included (1) parenting classes for eight weeks; (2) counseling; (3) AA meetings twice a week; (4) obtaining a chemical dependency evaluation; and (5) visits with N.S. and the social worker.
On August 30, 1989, N.S. had a supervised visit at the Department with his mother and grandmother. The caseworker reported her concern regarding the lack of bonding between N.S. and his mother and that N.S. was extremely out of control.
Between August 23, 1989 and November 7, 1989, N.S. was moved twice to new foster homes due to his behavior problems. Because of these problems, N.S. was referred to a psychologist, Lee Pfeifer (Pfeifer). Pfeifer determined that N.S. was exhibiting mild delays in both cognitive and motor development. She was concerned about N.S.'s speech and language delays. However, Pfeifer expressed the most concern regarding N.S.'s abnormal behavior. She believed that N.S. may have been abused and recommended extreme caution in returning N.S. to his mother.
On November 9, 1989, N.S. was returned to J.S. and the petition was dismissed. The court granted the agency legal custody for 60 days.
On November 28, 1989, J.S. asked the social worker newly assigned to her case, Sarah Gillem, if it was still possible to place N.S. for adoption.
On December 16, 1989, Social Services placed N.S. in his grandmother's custody for a month. Also, on that day grandmother had J.S. removed from the house. On January 11, 1990, grandmother requested that N.S. be removed from her home. According to grandmother, she wanted to get a job and therefore, there would be no one to care for N.S. Meanwhile, J.S. was attempting to participate in her parenting program. The adjudicatory hearing was to take place on January 24, 1990. By this date, J.S. had attended six sessions of her parenting class and had missed three.
At the adjudicatory hearing, N.S. was found to be dependent and neglected. On June 19, 1990, at the dispositional hearing, J.S.'s parental rights were terminated.[1]

DECISION

The trial court erred by not applying the Indian Child Welfare Act.
Under 25 U.S.C. § 1901 et seq., child custody proceedings involving the termination of parental rights to an Indian child are subject to specific minimum federal procedures and standards. Pursuant to these "minimum federal standards":
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of a qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional *99 or physical damage to the child. 25 U.S.C. § 1912(f). (emphasis added).
See Matter J.L.H., 299 N.W.2d 812 (S.D.1980).
Before the trial court is required to apply the standard for termination of parental rights set out in the Indian Child Welfare Act, some evidence must demonstrate that the child is Indian and that the act applies. Matter of B.R.B., 381 N.W.2d 283 (S.D.1986). In this case, N.S. is an "Indian child" within the meaning of the Indian Child Welfare Act. See 25 U.S.C. § 1903(4).[2] Although N.S.' paternity was not established until after termination, N.S.' Indian status was acknowledged prior to termination and the Cheyenne River Sioux Tribe was notified of the right to intervene in this action.[3] Further, in the middle of the dispositional hearing, the trial court put N.S.' father on the petition alleging N.S. to be dependent and neglected. Thus, the trial court in this action was required to apply the "minimum federal standards" provided by the act.
It is clear from the record that the federal standards were not followed at the dispositional stage of the state proceedings in this case. At the conclusion of the dispositional hearing, Judge Tice stated, in his bench ruling:
At this time the court finds beyond a reasonable doubt that termination of parental rights is the only reasonable alternative in the interest of the child.
The pertinent findings and conclusions entered by the trial court state:
That the State has shown beyond a reasonable doubt that the termination of the Respondent mother's parental rights over the minor child is the least restrictive alternative in the best interests of the minor child. (Finding VII).
By clear and convincing evidence no lesser restrictive alternative than termination of parental rights are available to this court to protect the minor children herein from continued serious emotional and physical harm. (Conclusion VII).
The final Dispositional Order states, in pertinent part:
Ordered, that by clear and convincing evidence it is necessary for the child's physical and mental well-being that the parental rights of the Respondent be terminated to the minor child; and it is further Ordered that by clear and convincing evidence, no lesser restrictive alternative than termination of parental rights are available to this court to protect the minor child from continued serious emotional and physical harm.
The application of the clear and convincing burden of proof to the language "serious emotional or physical harm to the child" as well as the application of the beyond a reasonable doubt burden of proof to the language "the only reasonable alternative in the interests of the child" clearly conflicts with section 1912(f) of ICWA. This section provides that there will be no termination unless it is shown by evidence beyond a reasonable doubt that "the continued custody of the child is likely to result in serious emotional or physical damage to the child."
Contrary to the requirement of 25 U.S.C. § 1912(f), the trial court reached its determination by applying the state law burden of proof[4] (clear and convincing) to *100 the federal language (that the continued custody of the child by the parent of Indian custodian is likely to result in serious emotional or physical harm to the child). Conclusion VII. This error is further evidenced by the trial court's Finding VII which applied the federal law burden (beyond a reasonable doubt) to the state language (termination of the Respondent Mother's parental rights over the minor child is the least restrictive alternative in the best interests of the minor child). Apparently the trial court was attempting to identify the interrelationship between our state code and ICWA. The trial court realized that considering the best interests of the Indian child and applying the minimum Federal standards of ICWA were concurrent obligations. However, it erred in the application of this obligation.[5]
In a termination case, the trial court must make clear and specific findings which conform to the statutory requirements. This was not done. Matter of R.M.M., 316 N.W.2d 538 (Minn.1982). We therefore reverse the trial court, with instructions to enter new findings of fact, conclusions of law and a dispositional order which conform to the federal standards found in 25 U.S.C. § 1901 et seq.[6] The new findings should be based upon the record as it existed at the conclusion of the dispositional hearing.
Reversed and remanded.
WUEST and AMUNDSON, JJ., concur.
MILLER, C.J., concurs in result without writing.
SABERS, J., concurs specially.
SABERS, Justice (concurring specially).
However pointless a remand may appear, the law is clear and the majority has read it correctly.
The Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963 (1988), is a preemptive federal law which governs all custody proceedings involving Indian children except those incident to divorce or to criminal acts committed by the child. 25 U.S.C. § 1903(1). The record shows that in this non-divorce, non-criminal proceeding, the circuit court itself identified N.S. as an "Indian child" within the meaning of 25 U.S.C. § 1903(4) prior to the termination of parental rights. See majority opinion at footnote 3.
Mississippi Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), authoritatively established the principle that the provisions of ICWA are to be strictly construed and applied. Moreover, this court has acknowledged that pre-Holyfield state court cases like Claymore v. Serr, 405 N.W.2d 650 (S.D.1987), and In re Adoption of Baby Boy L., 231 Kan. 199, 643 P.2d 168 (1982), are now doubtful authority, and that ICWA has effect even when the Indian child has never been raised in an Indian home. Matter of Adoption of Baade, 462 N.W.2d 485, 489 (S.D.1990).[*]
*101 Here, the circuit court found termination of J.S.'s parental rights to be both in the best interests of N.S. and the least restrictive alternative by clear and convincing evidence. Under ICWA, that is not enough. The case must be remanded and J.S.'s parental rights may not be terminated unless the court also finds that her continued custody of N.S. would "beyond a reasonable doubt ... likely ... result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f); Baade, 462 N.W.2d at 490.
NOTES
[1] On August 20, 1990, adjudicatory findings were entered as to C.D.S. who was determined to be the biological father of N.S. N.S. was found to be dependent and neglected.
[2] N.S.' father is a Native American.
[3] On December 28, 1989, notice was sent, by the State, to the Cheyenne River Sioux Tribe of the pending child custody proceedings. The notice stated, in part: "This notice is given pursuant to 25 U.S.C. 1912. The child(ren) who are/is the subject of this proceeding are/is named [N.S.] and are/is members of the Cheyenne River Sioux Tribe."

This is an admission, by the State, regarding N.S.' membership in the Cheyenne River Sioux Tribe. One who has taken a position in a judicial proceeding may not later take a position inconsistent with his earlier position. Time Out, Inc. v. Karras, 469 N.W.2d 380 (S.D.1991) (slip op. # 16991, # 16999); State v. St. Cloud, 465 N.W.2d 177 (S.D.1991); see Federal Land Bank v. Johnson, 446 N.W.2d 446 (S.D.1989).
[4] Under state law, in a termination of parental rights at a dispositional hearing, the trial court must find by clear and convincing evidence that termination of parental rights is in the child's best interest and the state must show that there is no narrower means of providing for the best interests and welfare of the child. In Interest of A.D., 416 N.W.2d 264 (S.D.1987).
[5] Here, the trial judge used the "clear and convincing" burden of proof 4 times in the Findings of Fact and Conclusions of Law and twice, later, in the formal order; hence, 6 times the burden was "clear and convincing."
[6] The appellee argues that ICWA is not applicable to this case, citing various authorities that stand for the proposition that the purpose of ICWA is for the maintenance of the Indian family. However, this Court recently stated that it is incorrect when assessing ICWA's applicability to a particular case, to focus only upon the interests of an existing Indian family. Matter of Adoption of Baade, 462 N.W.2d 485 (S.D.1990). See Note, The Indian Child Welfare Act of 1978; Does it Apply to the Adoption of an Illegitimate Indian Child?, 38 Cath.U.L.Rev. 511 (1989) ("in light of the legislative history of the ICWA, the existing Indian family theory is thus contrary to the intent of Congress." (Footnotes omitted.)). As we stated in Baade, such a practice fails to recognize the legitimate concerns of the tribe that are protected under the Act.
[*] While a statute should be construed according to its legislative intent when its terms are ambiguous, there is no need to reach back to what the legislature intended when a statute is unambiguous on its face. In fact, when a court ignores the clear provisions of a statute in reliance on what the court believes the legislature must have meant to say, the court is improperly engaging in judicial lawmaking.

Baby Boy L., has been criticized for just this kind of inappropriate judicial re-writing of ICWA:
The [adoptive parents] assert that [ICWA] does not apply where the child had never been a part of any Indian family relationship. See ... Baby Boy L..... [However,] the language of the Act contains no such exception. . . . [They] also assert that the Act should only be applied in light of the problem it was intended to solvethe removal of Indian children from their families by public and private social welfare agencies.... It is unnecessary to invoke the constructional rules urged by the [adoptive parents] as the Congressional intent is clear on the face of the statute.
In re Custody of S.B.R., 43 Wash.App. 622, 719 P.2d 154, 156 (1986) (emphasis added). See also Matter of Adoption of Child of Indian Heritage, 111 N.J. 155, 543 A.2d 925, 932 (1988) ("We disagree with [Baby Boy L.'s] interpretation of [ICWA] because it posits as a determinative jurisdictional test the voluntariness of the conduct of the mother. The Act itself does not suggest this factor as a jurisdictional test of the Act's coverage") (emphasis added). Accord Baade, 462 N.W.2d at 489.
25 U.S.C. § 1903(4) states that an unmarried minor is an "Indian child" for ICWA purposes if he is "a member of an Indian tribe." Since N.S. apparently is a member of the Cheyenne River Sioux Tribe, the provisions of ICWA apply to child custody proceedings involving N.S. There is simply no statutory requirement for N.S. to have been born into an Indian home or an Indian community in order to come within the provisions of ICWA, however much one might believe 25 U.S.C. § 1903(4) should have been written that way. No amount of probing into what Congress "intended" can alter what Congress said, in plain English, at 25 U.S.C. § 1903(4).